[No. B010156. Second Dist., Div. Five. July 30, 1986.†]

LOIS J. WICKLINE, Plaintiff and Respondent, v.
THE STATE OF CALIFORNIA, Defendant and Appellant.

†Review granted November 20, 1986. Review dismissed and opinion ordered published
July 30, 1987.

## COUNSEL

John K. Van de Kamp, Attorney General, Nelson Kempsky, Chief Deputy Attorney General, Richard Martland, Chief Assistant Attorney General, Marvin Goldsmith, Assistant Attorney General, Robert H. Francis and N. B. Peek, Deputy Attorneys General, for Defendant and Appellant.

John E. Shorkey as Amicus Curiae on behalf of Defendant and Appellant.

Thomas E. Bruyneel and Earley & Baruch for Plaintiff and Respondent.

Hassard, Bonnington, Rogers & Huber, David E. Willett, Catherine I. Hanson, Musick, Peeler & Garrett, Charles F. Forbes and William L. Abalona as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**ROWEN, J.*—**This is an appeal from a judgment for plaintiff entered after a trial by jury. For the reasons discussed below, we reverse the judgment.

Principally, this matter concerns itself with the legal responsibility that a third party payor, in this case, the State of California, has for harm caused to a patient when a cost containment program is applied in a manner which

---

*Assigned by the Chairperson of the Judicial Council

is alleged to have affected the implementation of the treating physician's medical judgment.

The plaintiff, respondent herein, Lois J. Wickline (plaintiff or Wickline) sued defendant, appellant herein, State of California (State of Medi-Cal). The essence of the plaintiff's claim is found in paragraph 16 of her second amended complaint which alleges: "Between January 6, 1977, and January 21, 1977, Doe I an employee of the State of California, while acting within the scope of employment, negligently discontinued plaintiff's Medi-Cal eligibility, causing plaintiff to be discharged from Van Nuys Community Hospital prematurely and whil [sic] in need of continuing hospital care. As a result of said negligent act, plaintiff suffered a complete occlusion of the right infra-renoaorta, necessitating an amputation of plaintiff's right leg."

I

Responding to concerns about the escalating cost of health care, public and private payors have in recent years experimented with a variety of cost containment mechanisms. We deal here with one of those programs: The prospective utilization review process.

At the outset, this court recognizes that this case appears to be the first attempt to tie a health care payor into the medical malpractice causation chain and that it, therefore, deals with issues of profound importance to the health care community and to the general public. For those reasons we have permitted the filing of amicus curiae briefs in support of each of the respective parties in the matter to assure that due consideration is given to the broader issues raised before this court by this case.

Traditionally, quality assurance activities, including utilization review programs, were performed primarily within the hospital setting under the general control of the medical staff. (See, generally, Cal. Admin. Code., tit. 22, § 70703; Joint Com. on Accreditation of Hospitals, Accreditation Manual for Hospitals (1985) Utilization Review, pp. 197-198; 42 U.S.C. § 1395x(k); 42 C.F.R. § 405.1035.) The principal focus of such quality assurance review schema was to prevent overutilization due to the recognized financial incentives to both hospitals and physicians to maximize revenue by increasing the amount of service provided and to insure that patients were not unnecessarily exposed to risks as a result of unnecessary surgery and/or hospitalization.

Early cost-containment programs utilized the retrospective utilization review process. In that system the third party payor reviewed the patient's chart after the fact to determine whether the treatment provided was medi-

cally necessary. If, in the judgment of the utilization reviewer, it was not, the health care provider's claim for payment was denied.

In the cost-containment program in issue in this case, prospective utilization review, authority for the rendering of health care services must be obtained before medical care is rendered. Its purpose is to promote the well recognized public interest in controlling health care costs by reducing unnecessary services while still intending to assure that appropriate medical and hospital services are provided to the patient in need. However, such a cost-containment strategy creates new and added pressures on the quality assurance portion of the utilization review mechanism. The stakes, the risks at issue, are much higher when a prospective cost-containment review process is utilized than when a retrospective review process is used.

A mistake conclusion about medical necessity following retrospective review will result in the wrongful withholding of payment. An erroneous decision in a prospective review process, on the other hand, in practical consequences, results in the withholding of necessary care, potentially leading to a patient's permanent disability or death.

## II

Though somewhat in dispute, the facts in this case are not particularly complicated. In 1976, Wickline a married woman in her mid-40's,[1] with a limited education, was being treated by Dr. Stanley Z. Daniels (Dr. Daniels), a physician engaged in a general family practice, for problems associated with her back and legs. Failing to respond to the physical therapy type of treatment he prescribed, Dr. Daniels had Wickline admitted to Van Nuys Community Hospital (Van Nuys or Hospital) in October 1976 and brought in another physician, Dr. Gerald E. Polonsky (Dr. Polonsky), a specialist in peripheral vascular surgery, to do a consultation examination. Peripheral vascular surgery concerns itself with surgery on any vessel of the body, exclusive of the heart.

Dr. Polonsky examined plaintiff and diagnosed her condition as arteriosclerosis obliterans with occlusion of the abdominal aorta, more generally referred to as Leriche's Syndrome. Leriche's Syndrome is a condition caused by the obstruction of the terminal aorta. (Dorland's Illustrative Medical Dictionary (26th ed.) p. 1293.) The aorta is the main artery of the body, carrying blood from the left ventrical of the heart to arteries in all organs and parts of the body. (*Id.,* p. 97.) In plaintiff's situation, the occlusion occurred just above the point where the aorta divides into two common

---

[1] Date of birth, March 14, 1928.

iliac arteries which descend, respectively, into each leg. The occlusion was due to arteriosclerosis. Arteriosclerosis is a thickening of the walls of the arteries. (*Id.,* p. 119.)

According to Dr. Polonsky, the only treatment for Leriche's Syndrome is surgical. In Wickline's case her disease was so far advanced that Dr. Polonsky concluded that it was necessary to remove a part of the plaintiff's artery and insert a synthetic (Teflon) graft in its place.

After agreeing to the operation, Wickline was discharged home to await approval of her doctor's diagnosis and authorization from Medi-Cal for the recommended surgical procedure and attendant acute care hospitalization. It is conceded that at all times in issue in this case, the plaintiff was eligible for medical benefits under California's medical assistance program, the "Medi-Cal Act," which is more commonly referred to as Medi-Cal. (Welf. & Inst. Code, §§ 14000 et seq., 14000.4.)

As required, Dr. Daniels submitted a treatment authorization request to Medi-Cal, sometimes referred to as form "161," "MC-161" or "TAR." In response to Dr. Daniels' request, Medi-Cal authorized the surgical procedure and 10 days of hospitalization for that treatment.

On January 6, 1977, plaintiff was admitted to Van Nuys by Dr. Daniels. On January 7, 1977, Dr. Polonsky performed a surgical procedure in which a part of plaintiff's artery was removed and a synthetic artery was inserted to replace it. Dr. Polonsky characterized that procedure as "a very major surgery."

Later that same day Dr. Polonsky was notified that Wickline was experiencing circulatory problems in her right leg. He concluded that a clot had formed in the graft. As a result, Wickline was taken back into surgery, the incision in her right groin was reopened, the clot removed and the graft was resewn. Wickline's recovery subsequent to the two January 7th operations was characterized as "stormy." She had a lot of pain, some spasm in the vessels in the lower leg and she experienced hallucinating episodes. On January 12, 1977, Wickline was returned to the operating room where Dr. Polonsky performed a lumbar sympathectomy.

A lumber sympathectomy is a major operation in which a section of the chain of nerves that lie on each side of the spinal column is removed. The procedure causes the blood vessels in the patient's lower extremity to become paralyzed in a wide open position and was done in an attempt to relieve the spasms which Wickline was experiencing in those vessels.

Spasms stop the outflow of blood from the vessels causing the blood to back up into the graft. Failure to relieve such spasms can cause clotting.

Dr. Polonsky was assisted in all three surgeries by Dr. Leonard Kovner (Dr. Kovner), a board certified specialist in the field of general surgery and the chief of surgery at Van Nuys. Dr. Daniels was present for the initial graft surgery on January 7, 1977, and for the right lumbar sympathectomy operation on January 12, 1977.

Wickline was scheduled to be discharged on January 16, 1977, which would mean that she would actually leave the hospital sometime before 1 p.m. on January 17, 1977. On or about January 16, 1977, Dr. Polonsky concluded that "it was medically necessary" that plaintiff remain in the hospital for an additional eight days beyond her then scheduled discharge date. Drs. Kovner and Daniels concurred in Dr. Polonsky's opinion.

Dr. Polonsky cited many reasons for his feeling that it was medically necessary for plaintiff to remain in an acute care hospital for an additional eight days, such as the danger of infection and/or clotting. His principal reason, however, was that he felt that he was going to be able to save both of Wickline's legs and wanted her to remain in the hospital where he could observe her and be immediately available, along with the hospital staff, to treat her if an emergency should occur.

In order to secure an extension of Wickline's hospital stay, it was necessary to complete and present to Medi-Cal a form called "Request for Extension of Stay in Hospital, "commonly referred to as an "MC-180" or "180." It is the hospital's responsibility to prepare the 180 form. The hospital must secure necessary information about the patient from the responsible physician. It then submits the 180 form to Medi-Cal's representative and obtains appropriate authorization for the hospital stay extension.

The physician's responsibility in the preparation of the 180 form is to furnish (to the hospital's representative) the patient's diagnosis, significant history, clinical status and treatment plan in sufficient detail to permit a reasonable, professional evaluation by Medi-Cal's representative, either the "on-site nurse" or/and the Medi-Cal Consultant, a doctor employed by the State for just such purpose.

The Medi-Cal Consultant's responsibility is to review requests submitted by private physicians on behalf of their patients for hospital treatment they believe necessary and to review requests for extensions of hospital time submitted on behalf of hospitalized patients. The Medi-Cal Consultant is not permitted to approve the request unless the information furnished is

timely, complete and indicates the medical necessity of the requested treatment.

At Van Nuys, Patricia N. Spears (Spears), an employee of the hospital and a registered nurse, had the responsibility for completing 180 forms. In this case, as requested by Dr. Polonsky, Spears filled out Wickline's 180 form and then presented it to Dr. Daniels, as plaintiff's attending physician, to sign, which he did, in compliance with Dr. Polonsky's recommendation. All of the physicians who testified agreed that the 180 form prepared by Spears was complete, accurate and adequate for all purposes in issue in this matter.

Doris A. Futerman (Futerman), a registered nurse, was, at that time, employed by Medi-Cal as a Health Care Service Nurse, commonly referred to as an "on-site nurse." As such, her primary duties were to contact, daily, a group of hospitals assigned to her to review requests for extensions of hospital stays prepared on behalf of patients in those particular hospitals. Van Nuys was one of the hospitals to which she was assigned.

Futerman had the authority, after reviewing a 180 form, to approve the requested extension of time without calling a Medi-Cal Consultant. She could not, however, either reject the request outright or authorize a lesser number of days than requested. If, for any reason, she felt she could not approve the extension of time in the hospital as requested, she was required to contact a Medi-Cal Consultant and that physician would make the ultimate decision on the request.

Futerman, after reviewing Wickline's 180 form, felt that she could not approve the requested eight-day extension of acute care hospitalization. While conceding that the information provided might justify some additional time beyond the scheduled discharge date, nothing in Wickline's case, in Futerman's opinion, would have warranted the entire eight additional days requested and, for those reasons, she telephoned the Medi-Cal Consultant. She reached Dr. William S. Glassman (Dr. Glassman), one of the Medi-Cal Consultants on duty at the time in Medi-Cal's Los Angeles office. The Medi-Cal Consultant selection occurred randomly. As was the practice, whichever Medi-Cal Consultant was available at the moment took the next call that came into the office.

Dr. Glassman was board certified in general surgery and had practiced in that field until 1975 when he became employed by the Department of Health of the State of California as a Medi-Cal Consultant I. At the time of trial Dr. Glassman was not employed by the State and attempts to personally serve him with a subpoena to appear as a witness in this case were

without success. Without objection from the State, Dr. Glassman's testimony was taken at trial by the reading of his deposition in open court.

After speaking with Futerman on the telephone, Dr. Glassman rejected Wickline's treating physician's request for an eight-day hospital extension and, instead, authorized an additional four days of hospital stay beyond the originally scheduled discharge date.

Dr. Glassman testified that since the initial request for extension of hospital stay is made to him by way of a telephone call from the on-site nurse, he does not actually see the 180 form itself until after he has acted on it, when it is forwarded to him for his signature. While there are appropriate places provided on the 180 form to indicate what the on-site nurse's recommendation is and the reason given for disapproval of the requested hospital stay extension by the Medi-Cal Consultant, both of those places were left blank on Wickline's 180 form. Dr. Glassman could not recall why he granted a four-day extension rather than the eight days requested by plaintiff's treating physician.

Neither Futerman nor Dr. Glassman had any specific recollection of the Wickline case. Each testified based upon their ordinary practice and procedure except where requested to state their opinion based on information provided to them at the time their respective testimony was taken as, for example, regarding information appearing on Wickline's 180 form.

After review of Wickline's 180 form, Dr. Glassman testified that the factors that led him to authorize four days, rather than the requested eight days, was that there was no information about the patient's temperature which he, thereupon, assumed was normal; nothing was mentioned about the patient's diet, which he then presumed was not a problem; nor was there any information about Wickline's bowel function, which Dr. Glassman then presumed was functioning satisfactorily. Further, the fact that the 180 form noted that Wickline was able to ambulate with help and that whirlpool treatments were to begin that day caused Dr. Glassman to presume that the patient was progressing satisfactorily and was not seriously or critically ill.

Dr. Glassman testified that he had no recollection of reviewing any documentary information available to him before rejecting the requested eight-day extension and authorizing four days instead. Initial treatment authorization requests, form MC-161, which had to be completed by the plaintiff's physician in order to obtain prior authorization from Medi-Cal for her initial hospitalization was, according to the State's own witness, Dr. Harry Kaufman (Dr. Kaufman), the chief Medi-Cal Consultant at the Los Angeles field office (and Dr. Glassman's supervisor), always supported by docu-

mentation submitted by the physician before such authorization was granted. Therefore, such material was apparently available to Dr. Glassman for review before he acted.

Further, it is reasonable to conclude from the record that Dr. Glassman did not consult with a specialist in peripheral vascular surgery before making his decision. Such specialists were employed by Medi-Cal, according to Dr. Kaufman, and were made available to Medi-Cal Consultants to confer with for special information and guidance in areas beyond the Medi-Cal Consultants' own general knowledge, training and experience.

In essence, respondent argues, Dr. Glassman based his decision on signs and symptoms such as temperature, diet and bowel movements, which were basically irrelevant to the plaintiff's circulatory condition for which she was being treated and did not concern himself with those symptoms and signs which an ordinary prudent physician would consider to be pertinent with regard to the type of medical condition presented by Wickline.

Complying with the limited extension of time authorized by Medi-Cal, Wickline was discharged from Van Nuys on January 21, 1977. Drs. Polonsky and Daniels each wrote discharge orders. At the time of her discharge, each of plaintiff's three treating physicians were aware that the Medi-Cal Consultant had approved only four of the requested eight-day hospital stay extension. While all three doctors were aware that they could attempt to obtain a further extension of Wickline's hospital stay by telephoning the Medi-Cal Consultant to request such an extension, none of them did so.

Dr. Polonsky, the senior man on the Wickline matter, and the specialist brought in specifically to treat Wickline's condition, was acknowledged by his associates as the doctor with primary responsibility in making decisions regarding her case. It would appear that both Drs. Daniels and Kovner, observing nothing that looked threatening to the patient, deferred to Dr. Polonsky and allowed Wickline to be discharged at the expiration of the period authorized by Dr. Glassman, the Medi-Cal Consultant.

At trial, Dr. Polonsky testified that in the time that had passed since the first extension request had been communicated to Medi-Cal, on January 16th or 17th, and the time of her scheduled discharge on January 21, 1977, Wickline's condition had neither deteriorated nor become critical. In Dr. Polonsky's opinion no new symptom had presented itself and no additional factors had occurred since the original request was made to have formed the basis for a change in the Medi-Cal Consultant's attitude regarding Wickline's situation. In addition, he stated that at the time of Wickline's discharge it did not appear that her leg was in any danger.

Dr. Polonsky testified that at the time in issue he felt that Medi-Cal Consultants had the State's interest more in mind than the patient's welfare and that that belief influenced his decision not to request a second extension of Wickline's hospital stay. In addition, he felt that Medi-Cal had the power to tell him, as a treating doctor, when a patient must be discharged from the hospital. Therefore, while still of the subjective, non-communicated, opinion that Wickline was seriously ill and that the danger to her was not over, Dr. Polonsky discharged her from the hospital on January 21, 1977. He testified that had Wickline's condition, in his medical judgment, been critical or in a deteriorating condition on January 21, he would have made some effort to keep her in the hospital beyond that day even if denied authority by Medi-Cal and even if he had to pay her hospital bill himself.

Dr. Daniels testified that he believed it was medically proper to discharge Wickline from the hospital on January 21, 1977. Dr. Kovner testified that while he did not recall whether or not he saw Wickline on January 21, as he was given credit for doing in a nurse's note in the hospital record, he did see her on January 19, 1977, and from his knowledge of her case he had no objection to her discharge from the hospital. Dr. Kovner stated that if he had seen (on the day of her discharge) "a grossly infected wound, that in anyway looked threatening to the patient," he would have done whatever was necessary to take measures to continue her hospitalization.

All of the medical witnesses who testified at trial agreed that Dr. Polonsky was acting within the standards of practice of the medical community in discharging Wickline on January 21, 1977.

Just prior to Wickline's actual discharge from the hospital, which she protested, Dr. Kovner met with her husband and explained to him how he was to administer to his wife's needs at home. That care consisted primarily of antibiotic powder for the groin incision, medication, warm water baths and bed rest.

Wickline testified that in the first few days after she arrived home she started feeling pain in her right leg and the leg started to lose color. In the next few days the pain got worse and the right leg took on a whitish, statue-like marble appearance. Wickline assumed she was experiencing normal recovery symptoms and did not communicate with any of her physicians. Finally, when "the pain got so great and the color started changing from looking like a statue to getting a grayish color," her husband called Dr. Kovner. It was Wickline's memory that this occurred about the third day after her discharge from the hospital and that Dr. Kovner advised Mr. Wickline to give extra pain medicine to the plaintiff.

Thereafter, gradually over the next few days, the plaintiff's leg "kept getting grayer and then it got bluish." The extra medication allegedly pre-

scribed by Dr. Kovner over the telephone did not relieve the pain Wickline was experiencing. She testified that "by then the pain was just excruciating, where no pain medicine helped whatsoever." Finally, Wickline instructed her husband to call Dr. Kovner again and this time Dr. Kovner ordered plaintiff back into the hospital. Wickline returned to Van Nuys that same evening, January 30, 1977, nine days after her last discharge therefrom.

Because Dr. Polonsky was not immediately available at the time, Dr. Kovner admitted Wickline into the hospital. She was admitted as an emergency patient and, therefore, did not require pre-authorization from Medi-Cal. On examination, after admission, Dr. Kovner found an open wound in the right groin area, a secondary infection in the femoral incision on the right, a mottled foot (areas of white mixed with areas of blue discoloration or pink discoloration) and a right leg that was cooler than the left leg. Wickline was experiencing severe unrelenting pain in the right lower extremity. Dr. Polonsky first examined Wickline on the day following her readmission to the hospital. His observations were similar to Dr. Kovner's. Dr. Polonsky concluded that Wickline had developed clotting in the right leg, that there was no circulation to that leg, and that she had developed an infection at the graft site.

Dr. Polonsky could not estimate when the infection in Wickline's leg first developed after her January 21st discharge from Van Nuys nor did he know when the clotting in that leg first started. Neither could he estimate as to how long the plaintiff's leg had been without circulation.

Because of the presence of the infection in the groin, Dr. Polonsky was unable to remove the clot surgically. To have attempted to do so, in Dr. Polonsky's opinion, would have resulted in spreading the graft's infection throughout the body, through the circulatory system, resulting in repetitive clotting and possible death from septicemia, blood poisoning.

Attempts to save Wickline's leg through the utilization of anticoagulants, antibiotics, strict bed rest, pain medication and warm water whirlpool baths to the lower extremity proved unsuccessful. On February 8, 1977, Dr. Polonsky amputated Wickline's leg below the knee because had he not done so "she would have died." The condition did not, however, heal after the first operation and on February 17, 1977, the doctors went back and amputated Wickline's leg above the knee.

Had the eight-day extension requested on Wickline's behalf been granted by Medi-Cal, she would have remained in the hospital through the morning hours of January 25, 1977. In Dr. Polonsky's medical opinion, based upon hypothetical questions derived from Wickline's recollection of her course

subsequent to her discharge from the hospital, had she been at Van Nuys on January 22, 23 or 24, he would have observed her leg change color, would have formed the opinion that she had clotted and would have taken her back into surgery and reopened the graft to remove the clot again, not an uncommon procedure in this type of case. As previously stated, he had performed a similar procedure on the first day of surgery, January 7, 1977. In addition thereto, Dr. Polonsky testified that had Wickline developed an infection while she was in the hospital, it could have been controlled with the vigorous use of antibiotics.

In Dr. Polonsky's opinion, to a reasonable medical certainty, had Wickline remained in the hospital for the eight additional days, as originally requested by him and her other treating doctors, she would not have suffered the loss of her leg.

Dr. Kovner testified that he had no recollection of speaking to Wickline or her husband on the telephone prior to January 30, 1977, the date of her readmission to the hospital, nor was there any notation in his chart of such a conversation, as it was his practice to do. In Dr. Kovner's opinion there was no direct relationship between Wickline's January 21 hospital discharge and the condition of the surgical site at the time she was readmitted to the hospital on January 30, 1977. Further, he testified that plaintiff's January 21st hospital discharge did not cause or contribute to the loss of her leg.

Dr. Daniels testified that he saw plaintiff at his office on January 28, 1977, one week after her discharge from Van Nuys. Dr. Daniels had no actual memory of that office visit but it was recorded in his office chart. He did not note any material or substantial change in Wickline's condition in his office medical chart from the time plaintiff was discharged from the hospital, as it was his general practice to do if such a change had occurred. From that he concluded that the condition of the incision site in the groin was essentially the same as when Wickline left the hospital.

Dr. Polonsky testified that in his medical opinion, the Medi-Cal Consultant's rejection of the requested eight-day extension of acute care hospitalization and his authorization of a four-day extension in its place did not conform to the usual medical standards as they existed in 1977. He stated that, in accordance with those standards, a physician would not be permitted to make decisions regarding the care of a patient without either first seeing the patient, reviewing the patient's chart or discussing the patient's condition with her treating physician or physicians.

### III

From the facts thus presented, appellant takes the position that it was not negligent as a matter of law. Appellant contends that the decision to dis-

charge was made by each of the plaintiff's three doctors, was based upon the prevailing standards of practice, and was justified by her condition at the time of her discharge. It argues that Medi-Cal had no part in the plaintiff's hospital discharge and therefore was not liable even if the decision to do so was erroneously made by her doctors.

Further, appellant raises the defense of the doctrine of discretionary immunity pursuant to Government Code section 820.2, and, finally, argues that the language of Government Code section 818.4 can reasonably be interpreted to apply to provide the State with absolute immunity in this matter.

## IV

Civil Code section 1714, derived from the common law, reads in pertinent part as follows: "Every one is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself."

In *Rowland* v. *Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561], the court reexamined the negligence liability rules applicable in this state and came to the conclusion that the principle embodied in this code section, i.e., Civil Code section 1714, serves as the foundation of our negligence law. ■ Rephrased, it establishes the general rule that " 'All persons are required to use ordinary care to prevent others being injured as a result of their conduct.' " And, " 'in the absence of statutory provision declaring an exception to the fundamental principle enunciated by section 1714 of the Civil Code, no such exception should be made unless clearly supported by public policy.' " (69 Cal.2d at p. 112.)

The opinion then sets forth broad criteria for determining the applicability of both the principal rule and the exceptions: "A departure from this fundamental principle involves the balancing of a number of considerations; the major ones are the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (69 Cal.2d at p. 112.)

Applying those standards to the facts in issue in this matter causes this court to conclude that appellant's contentions are well taken and that it is absolved from liability in this case as a matter of law.

Negligence is not absolute or to be measured in all cases in accordance with some precise standard, but always relates to some circumstance of time, place and person. (*Fouch* v. *Werner* (1929) 99 Cal.App. 557, 564 [279 P. 183].)

Dr. Kaufman, the chief Medi-Cal Consultant for the Los Angeles field office, was called to testify on behalf of the defendant. He testified that in January 1977, the criteria, or standard, which governed a Medi-Cal Consultant in acting on a request to consider an extension of time was founded on title 22 of the California Administrative Code. That standard was "the medical necessity" for the length and level of care requested. That, Dr. Kaufman contended, was determined by the Medi-Cal Consultant from the information provided him in the 180 form. The Medi-Cal Consultant's decision required the exercise of medical judgment and, in doing so, the Medi-Cal Consultant would utilize the skill, knowledge, training and experience he had acquired in the medical field.

Dr. Kaufman supported Dr. Glassman's decision. He testified, based upon his examination of the MC-180 form in issue in this matter, that Dr. Glassman's four-day hospital stay extension authorization was ample to meet the plaintiff's medically necessary needs at that point in time. Further, in Dr. Kaufman's opinion, there was no need for Dr. Glassman to seek information beyond that which was contained in Wickline's 180 form.

Dr. Kaufman testified that it was the practice in the Los Angeles Medi-Cal office for Medi-Cal Consultants not to review other information that might be available, such as the TAR 160 form (request for authorization for initial hospitalization), unless called by the patient's physician and requested to do so and, instead, to rely only on the information contained in the MC-180 form. Dr. Kaufman also stated that Medi-Cal Consultants did not initiate telephone calls to patient's treating doctors because of the volume of work they already had in meeting their prescribed responsibilities. Dr. Kaufman testified that any facts relating to the patient's care and treatment that was not shown on the 180 form was of no significance.

As to the principal issue before this court, i.e., who bears responsibility for allowing a patient to be discharged from the hospital, her treating physicians or the health care payor, each side's medical expert witnesses agreed that, in accordance with the standards of medical practice as it existed in January 1977, it was for the patient's treating physician to decide .

the course of treatment that was medically necessary to treat the ailment. It was also that physician's responsibility to determine whether or not acute care hospitalization was required and for how long. Finally, it was agreed that the patient's physician is in a better position than the Medi-Cal Consultant to determine the number of days medically necessary for any required hospital care. The decision to discharge is, therefore, the responsibility of the patient's own treating doctor.

Dr. Kaufman testified that if, on January 21, the date of the plaintiff's discharge from Van Nuys, any one of her three treating doctors had decided that in his medical judgment it was necessary to keep Wickline in the hospital for a longer period of time, they, or any of them, should have filed another request for extension of stay in the hospital, that Medi-Cal would expect those physicians to make such a request if they felt it was indicated, and upon receipt of such a request further consideration of an additional extension of hospital time would have been given.

Title 22 of the California Administrative Code, section 51110, provided, in pertinent part, at the relevant time in issue here, that: "The determination of need for acute care shall be made in accordance with the usual standards of medical practice in the community."

The patient who requires treatment and who is harmed when care which should have been provided is not provided should recover for the injuries suffered from all those responsible for the deprivation of such care, including, when appropriate, health care payors. Third party payors of health care services can be held legally accountable when medically inappropriate decisions result from defects in the design or implementation of cost-containment mechanisms as, for example, when appeals made on a patient's behalf for medical or hospital care are arbitrarily ignored or unreasonably disregarded or overridden. However, the physician who complies without protest with the limitations imposed by a third party payor, when his medical judgment dictates otherwise, cannot avoid his ultimate responsibility for his patient's care. He cannot point to the health care payor as the liability scapegoat when the consequences of his own determinative medical decisions go sour.

There is little doubt that Dr. Polonsky was intimidated by the Medi-Cal program but he was not paralyzed by Dr. Glassman's response nor rendered powerless to act appropriately if other action was required under the circumstances. If, in his medical judgment, it was in his patient's best interest that she remain in the acute care hospital setting for an additional four days beyond the extended time period originally authorized by Medi-Cal, Dr. Polonsky should have made some effort to keep Wickline

there. He himself acknowledged that responsibility to his patient. It was his medical judgment, however, that Wickline could be discharged when she was. All the plaintiff's treating physicians concurred and all the doctors who testified at trial, for either plaintiff or defendant, agreed that Dr. Polonsky's medical decision to discharge Wickline met the standard of care applicable at the time. Medi-Cal was not a party to that medical decision and therefore cannot be held to share in the harm resulting if such decision was negligently made.

In addition thereto, while Medi-Cal played a part in the scenario before us in that it was the resource for the funds to pay for the treatment sought, and its input regarding the nature and length of hospital care to be provided was of paramount importance, Medi-Cal did not override the medical judgment of Wickline's treating physicians at the time of her discharge. It was given no opportunity to do so. Therefore, there can be no viable cause of action against it for the consequences of that discharge decision.

▇ The California Legislature's intent, in enacting the Medi-Cal Act, was to provide "mainstream" medical care to the indigent. (*California Medical Assn.* v. *Brian* (1973) 30 Cal.App.3d 637, 642 [106 Cal.Rptr. 555].) ▇ The Legislature had expressly declared that Medi-Cal recipients should be able "whenever possible and feasible . . ., to the extent practical, . . . to secure health care in the same manner employed by the public generally, and without discrimination or segregation based purely on their economic disability." (Welf. & Inst. Code, § 14000.)

Welfare and Institutions Code section 14132 provided, in pertinent part, as follows: "The following is the schedule of benefits under this chapter: [¶] (b) In-patient hospital services, . . . are covered subject to utilization controls." Welfare and Institutions Code section 14133 provided, in pertinent part: "Utilization controls that may be applied to the services set forth in section 14132 which are subject to utilization controls shall be limited to: [¶] (a) Prior authorization, which is approval by a department [of health] consultant, of a specified service in advance of the rendering of that service based upon a determination of medical necessity."

Title 22 of the California Administrative Code set forth the pertinent regulations applicable to the State's Medi-Cal program. Section 51327 thereof dealt with inpatient hospitalization for other than emergency services and stated, in pertinent part, as follows: "(a)(2) Nonemergency hospitalization is covered only if prior authorization is obtained from the Medi-Cal Consultant before the hospital admission is effected. The Medi-Cal Consultant's authorization shall be for a specified number of days of hospital care. Continued necessary hospitalization beyond the specified number of days shall be covered after approval by the Medi-Cal Consultant has been

obtained by the hospital on or before the last day of the previously approved period of hospitalization." (Cal. Admin. Notice Register, tit. 22, Register 75, No. 43, pp. 1276.2.1-12762.2.)

In the case before us, the Medi-Cal Consultant's decision, vis-à-vis the request to extend Wickline's hospital stay, was in accord with then existing statutory law.

## V

This court appreciates that what is at issue here is the effect of cost-containment programs upon the professional judgment of physicians to prescribe hospital treatment for patients requiring the same. While we recognize, realistically, that cost consciousness has become a permanent feature of the health care system, it is essential that cost limitation programs not be permitted to corrupt medical judgment. We have concluded, from the facts in issue here, that in this case it did not.

For the reasons expressed herein, this court finds that appellant is not liable for respondent's injuries as a matter of law. That makes unnecessary any discussion of the other contentions of the parties.

The judgment is reversed.

Feinerman, P. J., and Hastings, J., concurred.