[No. C029159. Third Dist. Oct. 10, 2000.]

NOSRAT KHAJAVI, Plaintiff and Appellant, v.
FEATHER RIVER ANESTHESIA MEDICAL GROUP et al., Defendants
and Respondents.

[No. C029276. Third Dist. Oct. 10, 2000.]

NOSRAT KHAJAVI, Plaintiff and Respondent, v.
FEATHER RIVER ANESTHESIA MEDICAL GROUP, Defendant and
Appellant.

[No. C030087. Third Dist. Oct. 10, 2000.]

NOSRAT KHAJAVI, Plaintiff and Appellant, v.
FEATHER RIVER ANESTHESIA MEDICAL GROUP, Defendant and
Respondent.

**COUNSEL**

Weintraub Genshlea & Sproul, Rosemary Kelley, Charles L. Post and William S. Jue for Plaintiff and Appellant and for Plaintiff and Respondent.

Catherine I. Hanson and Astrid G. Meghrigian for California Medical Association as Amicus Curiae on behalf of Plaintiff and Appellant and Plaintiff and Respondent.

Biegler Opper & Ortiz, Robert P. Biegler and Jesse S. Ortiz III for Defendant and Respondent and for Defendant and Appellant Feather River Anesthesia Medical Group.

Wilke, Fleury, Hoffelt, Gould & Birney, David A. Frenznick and Anthony J. DeCristoforo for Defendant and Respondent Robert Del Pero.

**OPINION**

**KOLKEY, J.—**

### INTRODUCTION

Shortly after plaintiff Nosrat Khajavi (Khajavi), an anesthesiologist, and defendant Robert Del Pero, a surgeon, engaged in an altercation over the wisdom of proceeding with a particular surgery, defendant Feather River Anesthesia Medical Group (Feather River) terminated Khajavi's employment.[1] At trial, the court nonsuited Khajavi's claims that defendants Feather River and Robert Del Pero had discharged him, and conspired to discharge him, in violation of public policy—that is, in retaliation for advocating "medically appropriate health care" in violation of Business and Professions Code section 2056.[2] The jury determined, however, that Feather River had breached its oral employment agreement with Khajavi and awarded him $26,069.80.

Both sides have appealed. Khajavi contends that the trial court erred in granting a nonsuit on his conspiracy and wrongful discharge claims and by denying his postjudgment request for attorney fees based on his successful breach of contract claim. For its part, Feather River contends that the trial court committed instructional error in connection with Khajavi's claim for breach of contract.

---

[1] For ease of reference, and not owing to any disrespect, we will refer to Dr. Khajavi and the other individual defendants without their titles.

[2] Unless designated otherwise, all further statutory references are to the Business and Professions Code.

We conclude that the trial court erred in granting a nonsuit to Feather River on Khajavi's claim of wrongful discharge based on a violation of the public policy expressed in section 2056, but that the judgment should be affirmed in all other respects.

Section 2056, subdivision (c), provides that the ". . . rendering by any person of a decision to terminate an employment or other contractual relationship with or otherwise penalize, a physician and surgeon principally for advocating for medically appropriate health care . . . violates the public policy of this state." Relying on a case cited in the statute's declaration of purpose, the trial court concluded that section 2056 only applies to advocacy in disputes with a health care payor and thus nonsuited Khajavi's claims based on section 2056. But the plain language of the statute demonstrates that it protects physicians and surgeons from termination or penalty "for advocating for medically appropriate health care," without limitation. (§ 2056, subd. (c).) The trial court's contrary interpretation erroneously substituted the objective language of the statute's text for a subjective speculation of its legislative purpose in violation of the rules of statutory construction.

Nonsuit was nonetheless properly granted in favor of defendant Robert Del Pero. He could not be liable for wrongfully terminating, or conspiring to terminate, Khajavi's employment in violation of section 2056 because he had no employment relationship with Khajavi and thus had no legal power to discharge him. Only an employer can be liable for the tort of wrongful discharge of an employee, and "a third party who is not and never has been the plaintiff's employer cannot be bootstrapped by conspiracy into tort liability for a wrong he is legally incapable of committing." (*Weinbaum v. Goldfarb, Whitman & Cohen* (1996) 46 Cal.App.4th 1310, 1313 [54 Cal.Rptr.2d 462].)

Turning to Khajavi's successful claim for breach of his oral employment agreement, we conclude that the trial court properly refused Feather River's proposed instruction that an honest but mistaken belief could justify a discharge because the employment agreement here was for a specified term. Unlike a wrongful discharge based on an implied-in-fact contract, an employee who has a contract for a specified term may not be terminated prior to the term's expiration based on an honest but mistaken belief that the employee breached the contract: Such a right would treat a contract with a specified term no better than an implied contract that has no term; such a right would dilute the enforceability of the contract's specified term because an employee who had properly performed his or her contract could still be

terminated before the term's end; and such a right would run afoul of the plain language of Labor Code section 2924, which allows termination of an employment for a specified term only "in case of any willful breach of duty . . . habitual neglect of . . . duty or continued incapacity to perform it." Termination of employment for a specified term, before the end of the term, based solely on the mistaken belief of a breach, cannot be reconciled with either the governing statute's text or settled principles of contract law.

Finally, we conclude that Khajavi's claim for attorney fees, based on his oral employment contract claim, cannot succeed. That claim is based on a provision in a more comprehensive written agreement prepared by Feather River which Khajavi had not yet seen and to which Khajavi had not yet consented. As a matter of contract law, a party is entitled to the benefit of only those provisions to which the contracting parties have consented, not those to which they might later consent.

FACTUAL AND PROCEDURAL BACKGROUND

I. *The Employment of Khajavi*

Khajavi, a licensed physician and surgeon, is an anesthesiologist. Defendant Feather River is a corporation comprised of anesthesiologists practicing in the Yuba City area.[3]

In or about July 1995, Khajavi joined Feather River as one of three anesthesiologists whom it had hired that summer as independent contractors pursuant to written contracts. Khajavi was hired as a "locum tenens"—a physician who acts as a temporary substitute for another. The parties contemplated that during this period Feather River would evaluate Khajavi's work and decide whether to offer him regular employment. The other two anesthesiologists hired that summer as locum tenens were Dr. Sartaj Bains (Bains) and Dr. Brett Mathieson (Mathieson).

In or about September 1995, Feather River President Richard Del Pero told Khajavi that it had decided to offer him regular full-time employment along with Bains and Mathieson. All three new hires would be compensated at the same rate and receive the same benefits. All three were also told that Feather River would not enter into written employment contracts until after it had completed the negotiation of its own contract with the hospital at which it provided anesthesia services.

_____

[3]Feather River is comprised of both shareholder/officer anesthesiologists and employee anesthesiologists.

At the end of September or early October 1995, Khajavi became an employee of Feather River. From his conversations with Dr. Herbert Henderson, then chief of anesthesiology at Feather River, and Richard Del Pero, Khajavi believed that his employment contract would be for a period of two years, after which Feather River would decide whether to make him a shareholder.

## II. *Events Leading to Khajavi's Termination*

On February 21, 1996, there occurred the incident that Khajavi contends precipitated Feather River's decision to terminate his employment. On that day, Khajavi was preparing to administer anesthesia to an elderly patient undergoing cataract surgery. Before administering the sedative, Khajavi noticed that the patient was in atrial fibrillation, i.e., experiencing an irregular heartbeat. An irregular heartbeat poses significant additional risks to a patient during and after surgery, including the risk of stroke, where (as here) the patient also suffered from congestive heart failure and high blood pressure. When Khajavi asked the surgeon, ophthalmologist Robert Del Pero,[4] about the irregular heartbeat, the surgeon told him that the condition was not new and that the patient was already being treated for it. Relying on that representation, Khajavi administered the sedative, and Robert Del Pero gave the patient the requisite retrobulbar block by injecting an anesthetic behind the patient's eye. ·

Before the surgery began, Khajavi spoke with the patient's regular physician, who reported that the patient had not, in fact, been treated for an irregular heartbeat, and directed Khajavi to "cancel the case" and send the patient directly to his office.

Khajavi and Robert Del Pero then argued heatedly about whether the surgery should proceed. Khajavi told Robert Del Pero that it was not in the patient's best interest to proceed with the surgery. Robert Del Pero insisted otherwise. Khajavi refused to attend to the patient during the surgery, and she was not monitored by another anesthesiologist. Both men raised their voices; some patients and hospital staff may have heard them.

Within a day or two, Robert Del Pero related the incident to his brother, Richard Del Pero, the Feather River president.

On February 26, Richard Del Pero told a meeting of Feather River shareholders about his brother's argument with Khajavi. He reported that

---

[4]Robert Del Pero is not a member of, and has no business interest in, Feather River. We refer to defendant Robert Del Pero by his full name to distinguish him from his brother, Richard Del Pero, Feather River's president.

Khajavi had questioned the patient's irregular heartbeat only after the retrobulbar block had been given, that Khajavi had been "yelling" during the argument, and that Khajavi had refused to participate in the surgery. Some Feather River shareholders were concerned that Khajavi's public argument with Robert Del Pero would reflect badly upon the group as a whole and have a detrimental effect on its ongoing contract negotiations with the hospital.

Other concerns about Khajavi were also aired: Richard Del Pero told the shareholders that he believed that Khajavi was trying to set up a pain management clinic for his sole benefit; the shareholders discussed whether, in light of the return of a shareholder from sabbatical, there would be enough work to keep everyone busy; and some shareholders raised other grievances about Khajavi.

The shareholders thereafter voted to terminate Khajavi's employment. Khajavi was told by some Feather River shareholders that the incident with Robert Del Pero was "one of the main reasons" for his termination.

Two days later, Richard Del Pero told Khajavi that his contract was not going to be renewed, that he had to leave within 90 days, and that his schedule would be reduced in the meantime because of another shareholder's return from sabbatical. This 90-day deadline, which ran on June 1, 1996, may have been based on Feather River's erroneous assumption that the start date of Khajavi's employment contract had been June 1, 1995 (and not the end of September).

Sometime thereafter, Khajavi was told he could remain until October, but he had found another job (at reduced compensation) and left in or about June 1996.

### III. *The Lawsuit*

Khajavi brought this action against Feather River, Richard Del Pero, and Robert Del Pero, alleging six causes of action.

Only the second, fourth, and fifth causes of action are relevant to the appeals here. The second cause of action alleged that Feather River breached its oral employment contract with Khajavi, entered in September 1995. The fourth cause of action alleged that defendants had violated section 2056, or the policy expressed therein, by terminating him in retaliation for advocating medically appropriate health care during the cataract surgery conducted by Robert Del Pero. The fifth cause of action alleged that all defendants

conspired to retaliate against him for advocating medically appropriate health care.[5]

Richard Del Pero was later dismissed as a defendant, and the trial proceeded against defendants Feather River and Robert Del Pero.

At trial, Feather River denied that Khajavi's employment contract had been terminated. It characterized its action as a determination that his employment contract, which it claimed was for one year, would simply not be renewed. Richard Del Pero testified that Khajavi's disagreement with Robert Del Pero played a role in Feather River's decision not to renew Khajavi's contract, but denied that it was the principal reason for the decision. Feather River members testified that concerns over the amount of work available required that one of the three new anesthesiologists be let go, and that Khajavi was chosen because he was the only one with some negative marks on his record.

Khajavi pointed to statements by Feather River shareholders suggesting that his disagreement with Robert Del Pero was the reason for his termination. He also introduced expert testimony that his withdrawal from the cataract surgery was medically appropriate because the risks to the patient outweighed the surgery's benefits.

At the close of Khajavi's case-in-chief, defendants moved for nonsuit. The court granted Feather River's motion for nonsuit as to all causes of action, except the second cause of action for breach of oral contract, and granted a nonsuit in favor of Robert Del Pero as to the fourth and fifth causes of action—the only ones in which he was a named defendant. The jury returned a verdict in Khajavi's favor on his claim for breach of oral contract and awarded him $26,069.80.

These consolidated appeals followed.

## DISCUSSION

### I. *Khajavi's Appeal from the Grant of Nonsuit*

#### A. *Standard of Review*

■ "A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to

---

[5]The other causes of action were: breach of the written locum tenens agreement (the first cause of action), fraudulent inducement (the third cause of action), and money had and received (the sixth cause of action). The first cause of action was dismissed prior to trial.

permit a jury to find in his favor." (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291 [253 Cal.Rptr. 97, 763 P.2d 948]; Code Civ. Proc., § 581c.[6])

" 'In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded.' " (*Nally v. Grace Community Church, supra,* 47 Cal.3d at p. 291.)

"Since motions for nonsuit raise issues of law [citation], we review the rulings on those motions de novo, employing the same standard which governs the trial court [citation]." (*Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1541-1542 [50 Cal.Rptr.2d 395].)

B. *Feather River's Motion for Nonsuit as to the Fourth Cause of Action*

Khajavi first appeals from the trial court's ruling that granted Feather River a nonsuit as to his fourth cause of action. As noted earlier, Khajavi's fourth cause of action alleged that defendants wrongly terminated him in violation of section 2056 for advocating medically appropriate health care.[7]

---

[6]Code of Civil Procedure section 581c states in relevant part: "(a) Only after, and not before, the plaintiff has completed his or her opening statement, or after the presentation of his or her evidence in a trial by jury, the defendant, without waiving his or her right to offer evidence in the event the motion is not granted, may move for a judgment of nonsuit. [¶] (b) If it appears that the evidence presented, or to be presented, supports the granting of the motion as to some but not all of the issues involved in the action, the court shall grant the motion as to those issues and the action shall proceed as to the issues remaining. . . ."

[7]At the time of the events giving rise to this action, section 2056 provided as follows:
"(a) The purpose of this section is to provide protection against retaliation for physicians who advocate for medically appropriate health care for their patients pursuant to Wickline v. State of California [(1986)] 192 Cal.App.3d 1630 [239 Cal.Rptr. 810].
"(b) It is the public policy of the State of California that a physician and surgeon be encouraged to advocate for medically appropriate health care for his or her patients. For purposes of this section, 'to advocate for medically appropriate health care' means to appeal a payor's decision to deny payment for a service pursuant to the reasonable grievance or appeal procedure established by a medical group, independent practice association, preferred provider organization, foundation, hospital medical staff and governing body, or payer, or to protest a decision, policy, or practice that the physician, consistent with that degree of learning and skill ordinarily possessed by reputable physicians practicing according to the applicable legal standard of care, reasonably believes impairs the physician's ability to provide medically appropriate health care to his or her patients.
"(c) The application and rendering by any person of a decision to terminate an employment or other contractual relationship with or otherwise penalize, a physician and surgeon principally for advocating for medically appropriate health care consistent with that degree of learning

Subdivision (b) of section 2056 provides in part: "It is the public policy of the State of California that a physician and surgeon be encouraged to advocate for medically appropriate health care for his or her patients. . . ."

At the time of Feather River's motion for nonsuit, subdivision (c) of section 2056 provided: "The application and rendering by any person of a decision to terminate an employment or other contractual relationship with or otherwise penalize, a physician and surgeon principally for advocating for medically appropriate health care consistent with that degree of learning and skill ordinarily possessed by reputable physicians practicing according to the applicable legal standard of care violates the public policy of this state." (Stats. 1994, ch. 1119, § 2.)[8]

Although Feather River made no formal statement of the grounds for its motion for nonsuit, it is apparent from the record that the motion's basis was

and skill ordinarily possessed by reputable physicians practicing according to the applicable legal standard of care violates the public policy of this state.

"(d) This section shall not be construed to prohibit a payer from making a determination not to pay for a particular medical treatment or service, or to prohibit a medical group, independent practice association, preferred provider organization, foundation, hospital medical staff, hospital governing body acting pursuant to Section 809.05, or payer from enforcing reasonable peer review or utilization review protocols or determining whether a physician has complied with those protocols.

"(e) Medically appropriate health care in a hospital licensed pursuant to Section 1250 of the Health and Safety Code shall be defined by the hospital medical staff and approved by the governing body, consistent with that degree of learning and skill ordinarily possessed by reputable physicians practicing according to the applicable legal standard of care.

"(f) Nothing in this section shall be construed to prohibit the governing body of a hospital from taking disciplinary actions against a physician and surgeon as authorized by Sections 809.05, 809.4, and 809.5.

"(g) Nothing in this section shall be construed to prohibit the Medical Board of California from taking disciplinary actions against a physician and surgeon under Article 12 (commencing with Section 2220).

"(h) For purposes of this section, 'person' has the same meaning as set forth in Section 2032." (Stats. 1994, ch. 1119, § 2.)

[8]In 1996, the following sentence was added to the end of section 2056, subdivision (c): "No person shall terminate, retaliate against, or otherwise penalize a physician and surgeon for that advocacy, nor shall any person prohibit, restrict, or in any way discourage a physician and surgeon from communicating to a patient information in furtherance of medically appropriate health care." (Stats. 1996, ch. 260, § 1.)

It is an established canon of statutory interpretation that statutes must be applied prospectively unless the Legislature clearly intended a retroactive application. (*Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1207 [246 Cal.Rptr. 629, 753 P.2d 585]; *Aetna Cas. & Surety Co. v. Industrial. Acc. Commission* (1947) 30 Cal.2d 388, 393 [182 P.2d 159].) Nothing suggests the Legislature intended a retroactive application of this addition to subdivision (c). (Stats. 1996, ch. 260, § 1, p. 93.) Thus, for purposes of our analysis, we consider the text of subdivision (c) as it appeared before the 1996 amendment. The trial court was correct to do the same.

Khajavi's purported failure to establish that he had been terminated or otherwise penalized in retaliation for his disagreement with Robert Del Pero.

The trial court initially denied the motion for nonsuit. It opined: "I think they have a cause of action here. It boils down to at the very least did Dr. Khajavi make the right call in the operating room, and I'm going to let the jury decide that."

Later that same day, however, the trial court announced that it would "revisit" the issue, and ultimately granted Feather River's motion for nonsuit. ■ Relying on subdivision (a) of section 2056—that "[t]he purpose of this section is to provide protection against retaliation for physicians who advocate for medically appropriate health care for their patients pursuant to Wickline v. State of California[, *supra*,] 192 Cal.App.3d 1630"—the trial court observed that *Wickline* "concern[ed] a problem in [the] medical cost containment arena where you have doctors that . . . argue with . . . health care payors about whether . . . medical treatment is appropriate," and concluded that the statute applied only to retaliation in disputes with a third party payor. So limited, the court reasoned that the statute could not impose liability on Feather River: "[T]here is nothing in this case that would indicate that [Khajavi's claim] arises from a desire to argue with the person that is responsible for paying for the treatment . . . . This is just an internal beef between a doctor or doctors and their medical corporation."[9]

This interpretation of the statute was erroneous because it ignores the statute's plain language, which best expresses its legislative intent.

### 1. *The Construction of Section 2056*

In construing a statute, we apply familiar principles of statutory construction.

■ "The fundamental task of statutory construction is to 'ascertain the intent of the lawmakers so as to effectuate the purpose of the law. [Citations.] In order to determine this intent, we begin by examining the language of the statute.'" (*People v. Cruz* (1996) 13 Cal.4th 764, 774-775 [55 Cal.Rptr.2d 117, 919 P.2d 731].)

It is well settled that " '[t]he statutory language . . . is the best indicator of legislative intent.' " (*Williams v. Superior Court* (1993) 5 Cal.4th 337, 350

---

[9]The trial court also granted Feather River's motion for nonsuit on the fifth cause of action—conspiracy to retaliate against Khajavi in violation of section 2056—but Khajavi does not appeal from the nonsuit granted to Feather River on that claim.

[19 Cal.Rptr.2d 882, 852 P.2d 377], quoting *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 826 [4 Cal.Rptr.2d 615, 823 P.2d 1216]; accord, *Hsu v. Abbara* (1995) 9 Cal.4th 863, 870 [39 Cal.Rptr.2d 824, 891 P.2d 804].) Indeed, the most powerful safeguard for the courts' adherence to their constitutional role of construing, rather than writing, statutes is to rely on the statute's plain language. (See *Seaboard Acceptance Corp. v. Shay* (1931) 214 Cal. 361, 365 [5 P.2d 882] ["This court has no power to rewrite the statute so as to make it conform to a presumed intention which is not expressed. This court is limited to interpreting the statute, and such interpretation must be based on the language used"].)

■ In relying on the statute's text as the best indicator of legislative intent, "[w]henever possible a construction must be adopted which will give effect to all provisions of the statute." (*Parris v. Zolin* (1996) 12 Cal.4th 839, 845 [50 Cal.Rptr.2d 109, 911 P.2d 9].) "[W]e cannot read the words of a statute in isolation, ignoring their context. We must read a statute as a whole and attempt to harmonize its elements by considering each clause or section in the context of the overall statutory framework. [Citation.] We are obligated to select the construction that comports most closely with the apparent intent of the Legislature, to promote rather than defeat the statute's general purpose and to avoid an interpretation that would lead to absurd and unintended consequences. [Citation.] We must not construe a statute in a manner that renders its provisions essentially nugatory or ineffective, particularly when that interpretation would frustrate the underlying legislative purpose. [Citation.]" (*People v. Carter* (1996) 48 Cal.App.4th 1536, 1540 [56 Cal.Rptr.2d 309]; accord, *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323].)

■ All of these rules of statutory construction—which elevate the objective text of the statute over subjective speculation of legislative intent—support our conclusion that the language of section 2056 does not limit its protection to disputes by physicians over decisions by third party payors or concerning cost containment, as contended by Feather River on appeal.

First, the plain language of section 2056 does not justify the narrow construction suggested by Feather River. Section 2056, subdivision (b), states: "It is the public policy of the State of California that a physician and surgeon be encouraged to advocate for medically appropriate health care for his or her patients."

Section 2056, subdivision (b) then defines the term "to advocate for medically appropriate health care" to extend beyond the right to dispute a

third party payor's decision. Instead, the right to advocate is comprised of two disjunctive parts: "For purposes of this section, 'to advocate for medically appropriate health care' means to appeal a payor's decision to deny payment for a service pursuant to the reasonable grievance or appeal procedure established by a medical group, independent practice association, . . . or payer, **or** to protest a decision, policy, or practice that the physician, consistent with that degree of learning and skill ordinarily possessed by reputable physicians practicing according to the applicable legal standard of care, reasonably believes impairs the physician's ability to provide medically appropriate health care to his or her patients." (§ 2056, subd. (b), emphasis added.)

Accordingly, the Legislature has declared that it is the public policy of this state to encourage two types of advocacy for medically appropriate health care: (1) an appeal from a payor's decision to deny payment, and (2) a protest of a decision, policy, or practice that the physician reasonably believes impairs his or her ability to provide medically appropriate health care.

This definition is not ambiguous. Indeed, by juxtaposing the right to appeal from a payor's decision with the broader right to protest a decision, policy, or practice that impairs the physician's ability to provide medically appropriate health care, the Legislature showed that it knows how to limit the right to advocate to those decisions that deny payment, but chose not to do so. (Cf. *Johnson & Johnson v. Superior Court* (1985) 38 Cal.3d 243, 250 [211 Cal.Rptr. 517, 695 P.2d 1058].)

Section 2056, subdivision (c), upon which Khajavi's claim relies, is likewise unambiguous. It provides: "The application and rendering by any person of a decision to terminate an employment or other contractual relationship with or otherwise penalize, a physician and surgeon principally for advocating for medically appropriate health care consistent with that degree of learning and skill ordinarily possessed by reputable physicians practicing according to the applicable legal standard of care violates the public policy of this state."[10]

Far from limiting its application to disputes with a third party payor or over cost containment, this declaration—that public policy is violated whenever "any person" decides to terminate or penalize a physician "principally for advocating for medically appropriate health care"—expresses an unambiguous legislative intent to apply the statute broadly—to protect physicians'

---

[10]See footnote 8, *ante.*

exercise of their professional judgment in advocating for medically appropriate health care, without limitation over the basis of the dispute. If the words of the statute are not ambiguous, "we presume that the Legislature meant what it said and the plain meaning of the statute is controlling. [Citation.]" (*People v. Carter, supra,* 48 Cal.App.4th at p. 1540; *People v. Coronado* (1995) 12 Cal.4th 145, 151 [48 Cal.Rptr.2d 77, 906 P.2d 1232].)

Indeed, the "person" who makes the decision to terminate or penalize a physician, against whose actions the statute affords protection, extends beyond a third party payor. A "person" is defined to have "the same meaning as set forth in Section 2032" (§ 2056, subd. (h)), and that section defines "person" as "any individual, partnership, corporation, limited liability company, or other organization. . . ." (§ 2032.)

Subdivision (d) of section 2056 also suggests that the statute was not limited to protecting physicians in disputes with health care payors or over cost containment. That subdivision provides that "[t]his section shall not be construed to prohibit a payer from making a determination not to pay for a particular medical treatment or service, or to prohibit a medical group, independent practice association . . . or payer from enforcing reasonable peer review or utilization review protocols . . . ." The fact that this saving clause exempts from the statute's coverage both the right of a payor to refuse to pay for medical treatment and the right of a medical group to enforce reasonable peer review further demonstrates that the statutory protections that necessitated this exemption extend beyond cost-containment decisions.

The trial court's interpretation of the statute, in contrast, gave no effect to the broad language in subdivisions (b), (c), and (d) of section 2056, and would rewrite the statute to add a qualification not existing anywhere in it. ■ " ' "[I]n construing . . . statutory provisions a court is not authorized to insert qualifying provisions not included and may not rewrite the statute to conform to an assumed intention which does not appear from its language." ' " (*In re Hoddinott* (1996) 12 Cal.4th 992, 1002 [50 Cal.Rptr.2d 706, 911 P.2d 1381].)

■ Admittedly, as the trial court observed, subdivision (a) of section 2056, in isolation, could be construed to suggest a narrower purpose. Section 2056, subdivision (a), states that "[t]he purpose of this section is to provide protection against retaliation for physicians who advocate for medically appropriate health care for their patients pursuant to Wickline v. State of California[, *supra,*] 192 Cal.App.3d 1630." *Wickline v. State of California, supra,* 192 Cal.App.3d at page 1645, held that a health care payor was not

responsible for the harm caused from the limitation it imposed on the length of a patient's hospitalization when the treating physicians themselves discharged the patient on the appointed date. Instead, the court in *Wickline* concluded that "the physician who complies without protest with the limitations imposed by a third party payor, when his medical judgment dictates otherwise, cannot avoid his ultimate responsibility for his patient's care." (192 Cal.App.3d at p. 1645.)

However, the fact that section 2056 declares under subdivision (a) that its purpose is to provide protection against retaliation for physicians who advocate for their patients "pursuant to *Wickline*" does not mean that the protected advocacy is limited to the factual circumstances of *Wickline*. "[A]dvocat[ing] for medically appropriate health care . . . pursuant to *Wickline*" need mean no more than advocating for medically appropriate health care *pursuant to the responsibility established* by *Wickline*. Such a construction harmonizes the language of section 2056, subdivision (a), with the unambiguously broader text of subdivisions (b), (c), and (d). This, of course, comports with the rule of statutory construction to give effect to all provisions of a statute whenever possible. (*Parris v. Zolin, supra,* 12 Cal.4th at p. 845; Code Civ. Proc., § 1858.)

Indeed, to construe the statute's purpose more narrowly—to protect only protests against third-party-payor decisions—would require us to ignore the plain language of subdivisions (b), (c), and (d) of section 2056 in violation of the rules of statutory construction. " ' "[I]n construing the statutory provisions a court . . . may not rewrite the statute to conform to an assumed intention which does not appear from its language." ' [Citations.]" (*In re Hoddinott, supra,* 12 Cal.4th at p. 1002.) And the statute's reference to *Wickline* in subdivision (a) of section 2056 does not suggest an intention to limit the statute to the factual circumstances of *Wickline*— in the face of the statute's broader language.

A review of the legislative history also demonstrates that a broader interpretation, which comports with the language of the remaining subdivisions, is the correct one. ■ "To the extent that uncertainty remains in interpreting statutory language, . . . both legislative history and the 'wider historical circumstances' of the enactment may be considered. [Citation.]" (*People v. Cruz, supra,* 13 Cal.4th at pp. 782-783.)

Section 2056 was sponsored by the California Medical Association. The bill analyses show that the bill was intended "to provide an express statutory public policy in favor of physicians' advocacy for appropriate health care of

their patients and against employment termination or penalization of physicians for such advocacy" and to *"state* that a physician who has an employment or other contractual relationship with a person should not be terminated or otherwise penalized principally for advocating for appropriate health care for his or her patient." (Sen. Com. on Business and Professions, analysis of Assem. Bill No. 1676 (1993-1994 Reg. Sess.) July 12, 1993, p. 1, original italics; Off. of Sen. Floor Analyses, analysis of Assem. Bill No. 1676 (1993-1994 Reg. Sess.) Aug. 30, 1993, p. 2.) This purpose comports with a broad interpretation of the statute.

 Second, the bill analyses make clear that the bill's reference to *Wickline* was only intended to refer to the *responsibility* of physicians to advocate for medically appropriate health care for their patients, not to limit the statute's protections to the facts of *Wickline.* Specifically, the analyses observed that despite the policy expressed in *Wickline* in favor of physician advocacy, "current case law requires such public policy to be expressed clearly in statute." (Sen. Com. on Business and Professions, analysis of Assem. Bill No. 1676, *supra,* July 12, 1993, p. 2; Off. of Sen. Floor Analyses, analysis of Assem. Bill No. 1676, *supra,* Aug. 30, 1993, p. 3.) Thus, the purpose of the bill was to codify the policy expressed in *Wickline.* Indeed, one bill analysis referred to *Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083, 1095 [4 Cal.Rptr.2d 874, 824 P.2d 680] (subsequently overruled on another ground in *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 80, fn. 6 [78 Cal.Rptr.2d 16, 960 P.2d 1046]), which cautioned that "courts in *wrongful discharge actions* may not declare public policy without a basis in either constitutional or statutory provisions." The analysis explained that if physicians were to be protected against wrongful discharge in violation of public policy, *Gantt v. Sentry Insurance* required that the public policy expressed in *Wickline*—the "advoca[cy] for appropriate care"—be placed in statute: ". . . the sponsor concludes that since doctors are required under *Wickline* to advocate for appropriate care, termination based on performance of this duty would violate public policy. However, *Gantt* requires that this public policy be statutorily codified to be effective, which [the bill] would accomplish." (Assem. Com. on Health, analysis of Assem. Bill No. 1676 (1993-1994 Reg. Sess.) May 18, 1993, p. 2.) Accordingly, the purpose of section 2056 was to declare in statute the public policy expressed in *Wickline,* requiring doctors "to advocate for appropriate care." (Assem. Com. on Health, analysis of Assem. Bill No. 1676, *supra,* at p. 2.) The reference to *Wickline* was not intended to limit the protection afforded under the statute to the factual circumstances of that case.

Admittedly, the analyses also noted that the California Medical Association's sponsorship was a result of "numerous and increasing numbers of

complaints from physicians who have been terminated by managed health care plans, physician groups, physician networks and others allegedly as a consequence of having challenged the utilization review decisions of those organizations on behalf of their patients." (Sen. Com. on Business and Professions, analysis of Assem. Bill No. 1676, *supra,* July 12, 1993; Off. of Sen. Floor Analyses, analysis of Assem. Bill No. 1676, *supra,* Aug. 30, 1993.) ■ However, the specific impetus for a bill does not limit its scope when its text speaks to its subject more broadly, as here: "[S]tatutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." (*Oncale v. Sundowner Offshore Services, Inc.* (1998) 523 U.S. 75, 79[118 S.Ct. 998, 1002, 140 L.Ed.2d 201, 207].) Indeed, when the Legislature has made a deliberate choice by selecting broad and unambiguous statutory language, "it is unimportant that the particular application may not have been contemplated." (*Barr v. United States* (1944) 324 U.S. 83, 90 [65 S.Ct. 522, 525, 89 L.Ed. 765, 771]; see *Souza v. Lauppe* (1997) 59 Cal.App.4th 865, 874 [69 Cal.Rptr.2d 494] ["Even if . . . the Legislature did not have such an application in mind when it enacted [the statute], a different construction is not required because our interpretation of the statute is compelled by the plain meaning of its words, does not frustrate its apparent purpose, and does not result in absurd consequences"].)

■ In sum, section 2056 should be construed as its text reads: to provide that the termination or penalization of a physician and surgeon "principally for advocating for medically appropriate health care . . . violates the public policy of this state," whether or not the advocacy protests a cost-containment decision. Such a construction conforms with the statute's unambiguous language, gives effect to all of its provisions, promotes its stated statutory purpose, and is supported by its legislative history.

## 2. *The Sufficiency of Evidence for Khajavi's Claim*

■ The discharge of an employee in contravention of fundamental public policy, as expressed in a statute or constitutional provision, can serve as the basis for a tort action for wrongful discharge. (*Gantt v. Sentry Insurance, supra,* 1 Cal.4th at pp. 1094-1097; see *Rojo v. Kliger* (1990) 52 Cal.3d 65, 88-91 [276 Cal.Rptr. 130, 801 P.2d 373].) Accordingly, since section 2056 expresses a public policy to protect physicians and surgeons from retaliation for advocating medically appropriate health care, a wrongful

discharge action can be premised on a termination in violation of that public policy.[11]

In this case, there was sufficient evidence adduced at trial from which the jury could have concluded (1) that the termination of Khajavi's employment with Feather River was principally the result of his disagreement with Robert Del Pero concerning the cataract surgery, and (2) that Khajavi's disagreement constituted a "protest . . . [of] a decision, policy or practice" that Khajavi reasonably believed, consistent with the standards of his profession, impaired his ability to provide medically appropriate health care to a patient within the meaning of section 2056. Indeed, the trial court had considered the evidence sufficient to go to the jury on this claim before it erroneously narrowed its interpretation of section 2056.

In light of the foregoing, the judgment of nonsuit in favor of Feather River on Khajavi's fourth cause of action must be reversed.

### C. *Robert Del Pero's Motion for Nonsuit*

Robert Del Pero moved for nonsuit on the fourth cause of action on the grounds that (1) he "had absolutely no power to affect Dr. Khajavi's employment relationship with [Feather River] whatsoever" and (2) Khajavi had not "present[ed] sufficient evidence . . . that Dr. [Robert] Del Pero retaliated against him." He also moved for nonsuit on the fifth cause of action (conspiracy to discharge or penalize Khajavi in violation of § 2056) on the ground that he could not be liable for a conspiracy to terminate Khajavi because he lacked the ability to terminate Khajavi's employment.

The court agreed that the evidence failed to establish that Robert Del Pero had any power to terminate or penalize Khajavi and that there was no evidence of a conspiracy. Accordingly, it granted the motion for nonsuit as to both causes of action.

On appeal, Khajavi contends that the trial court erred in granting Robert Del Pero's motion for nonsuit. We disagree.

---

[11]This has been made even more clear by the 1996 amendment to subdivision (c) of section 2056, which added the sentence: "No person shall terminate, retaliate against, or otherwise penalize a physician and surgeon for that advocacy . . . ." (Stats. 1996, ch. 260, § 1.) However, we have no need to consider, and do not address, whether this provision creates a separate statutory claim for wrongful termination—apart from a tort claim for wrongful termination based on a violation of public policy—in light of the fact that this provision was not in effect at the time of the alleged wrongful acts. (See *Russell v. Superior Court* (1986) 185 Cal.App.3d 810, 814 [230 Cal.Rptr. 102] [newly enacted statutes are presumed to apply prospectively unless a clear legislative intent to the contrary is expressed]; fn. 8, *ante.*)

## 1. *The Fourth Cause of Action*

Khajavi's fourth cause of action alleges that "his termination from . . . Feather River . . . was in retaliation for having advocated the medically appropriate cancellation of Dr. Robert Del[]Pero's ophthalmological surgical procedure" in violation of section 2056, or the "important public policy" expressed therein.

As a matter of law, only an employer can be liable for the tort of wrongful discharge in violation of public policy. (*Weinbaum v. Goldfarb, Whitman & Cohen, supra,* 46 Cal.App.4th at p. 1315; *Jacobs v. Universal Development Corp.* (1997) 53 Cal.App.4th 692, 704 [62 Cal.Rptr.2d 446]; *Phillips v. Gemini Moving Specialists* (1998) 63 Cal.App.4th 563, 575 [74 Cal.Rptr.2d 29].) After all, "the duty on which the tort is based is a creature of the employer-employee relationship, and the breach of that duty is the employer's improper discharge of an employee . . . ." (*Weinbaum v. Goldfarb, Whitman & Cohen, supra,* 46 Cal.App.4th at p. 1315.)

Because it is undisputed that Robert Del Pero had no employment relationship with Khajavi, he cannot be liable for the termination of Khajavi's employment.

Khajavi acknowledges that someone other than an employer cannot wrongfully discharge an employee, but argues, relying on the language of section 2056, that "[t]he jury should have been allowed to determine if Dr. Robert Del Pero's complaint to his brother, his conduct at the surgery center, . . . and the contradiction between his testimony and his brother's testimony constituted retaliation or a penalty against Dr. Khajavi for having advocated medically appropriate care."

We concede that section 2056, subdivision (c), covers a decision to both "terminate an employment" or "otherwise penalize" a physician in retaliation for that physician's advocacy of medically appropriate health care. However, the only penalty alleged in the fourth cause of action is the termination of Khajavi's employment. And the only conduct of Robert Del Pero about which Khajavi complains on appeal is the conduct that led to his termination. Thus, this appeal cannot properly invoke the penalty prong of section 2056, subdivision (c).

Moreover, if Robert Del Pero's complaint to his brother or his testimony alone, without more, could constitute a penalty within the meaning of the statute, we would distort the meaning of penalty, and create the unanticipated anomaly that a statute meant to protect physicians from retaliation for

their advocacy of medically appropriate health care could itself be used to retaliate against those very physicians who express their views concerning medically appropriate health care in the form of complaints or testimony against another physician. "Penalty" is defined by the dictionary as a "disadvantage, loss, or hardship due to some action (as transgression or error)." (Webster's 3d New Internat. Dict. (1986) p. 1668.) A complaint or testimony is not a "disadvantage, loss, or hardship"; only the action that may result therefrom can be. In this case, the conduct alleged in the complaint—the termination that constituted the retaliation in purported violation of the public policy expressed in section 2056—can be legally accomplished only by the employer; thus, Robert Del Pero cannot be held liable in the fourth cause of action for Khajavi's discharge.

The trial court did not err in granting a nonsuit on that claim in Robert Del Pero's favor.

### 2. The Fifth Cause of Action

Khajavi's fifth cause of action for conspiracy alleges that "[d]efendants conspired to retaliate against Plaintiff . . . for advocating medically appropriate care . . . , among other things by: (1) terminating Plaintiff's employment with [Feather River]; (2) denying Plaintiff monies owed him by [Feather River]; and (3) denying Plaintiff's appointment as director of the pain management clinic."

Once again, Robert Del Pero was legally incapable of taking any of these actions against Khajavi. ■■■ "Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. [Citation.] By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy." (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 510-511 [28 Cal.Rptr.2d 475, 869 P.2d 454]; accord, 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 44, p. 107.) However, "[b]y its nature, tort liability arising from conspiracy presupposes that the coconspirator is legally capable of committing the tort, i.e., that he or she owes a duty to plaintiff recognized by law and is potentially subject to liability for breach of that duty." (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd., supra,* 7 Cal.4th at p. 511.)

■■■ Thus, Khajavi's claim of conspiracy to terminate his employment fails as to Robert Del Pero because a nonemployer defendant—who cannot commit the tort of wrongful discharge in violation of public policy—can

have no liability for a conspiracy to wrongfully discharge the employee: "[A] third party who is not and never has been the plaintiff's employer cannot be bootstrapped by conspiracy into tort liability for a wrong he is legally incapable of committing." (*Weinbaum v. Goldfarb, Whitman & Cohen, supra,* 46 Cal.App.4th at p. 1313; accord, *Kasparian v. County of Los Angeles* (1995) 38 Cal.App.4th 242, 264-266 [45 Cal.Rptr.2d 90].)

As explained by the Court of Appeal in *Weinbaum v. Goldfarb, Whitman & Cohen, supra,* 46 Cal.App.4th at page 1315, "Because tort liability arising from conspiracy presupposes that the coconspirator is *legally capable of committing the tort* (because he owes a duty to the plaintiff recognized by law and is thus potentially subject to liability for a breach of that duty), we hold that a third party who is *not* (and never was) the plaintiff's employer cannot be liable for conspiracy to wrongfully terminate the plaintiff's employment in violation of public policy." (*Weinbaum v. Goldfarb, Whitman & Cohen, supra,* 46 Cal.App.4th at p. 1315, original italics, fn. omitted; *Jacobs v. Universal Development Corp., supra,* 53 Cal.App.4th at p. 704.)

Khajavi argues that these authorities are distinguishable because "[a]ny 'person' can violate section 2056. As a result, any person can conspire to retaliate or penalize in violation of section 2056." However, the only person who can violate the public policy expressed in section 2056 is the one who renders the decision to terminate the employment of, or penalize, the physician. The only retaliation against Khajavi which he alleges in his complaint is that which his employer, Feather River, could do, namely, terminate him, deny him monies owed by it, or deny his appointment as director of the pain management clinic. Nothing in the evidence suggests that Robert Del Pero had the authority to terminate or discipline Khajavi or deny him monies. Moreover, the only evidence of damages adduced at trial arose from the decision to terminate Khajavi's employment. Thus, the only retaliation at issue was not within the legal power of Robert Del Pero.

The nonsuit in favor of Robert Del Pero was properly granted.

## II. *Feather River's Claim of Instructional Error*

■ Challenging the verdict in favor of Khajavi's second cause of action for breach of his oral employment agreement, Feather River contends that the trial court erred "when it refused to allow . . . Feather River to present a jury instruction . . . that Feather River had a good faith belief that cause existed for Feather River to legally terminate [Khajavi's] employment contract."

At trial, Feather River proposed that the trial court instruct the jury with BAJI No. 10.37 (8th ed. 1998) as follows: "An employer who acts in good

faith on an honest but mistaken belief that discharge of an employee is required by a legitimate business reason has not breached the employment contract. If you find that Feather River Anesthesia Group honestly believed that the termination of plaintiff was for a legitimate business reason (wrongfully abandoning a patient) you must find for Feather River Medical Group even if Feather River Medical Group was mistaken in that belief." Its request for the instruction was rejected by the trial court.[12]

Feather River contends the refusal to instruct with BAJI No. 10.37 was error because "[a]t trial and all times prior thereto, it was Feather River's contention that it terminated Khajavi's employment contract with Feather River because of what it considered misconduct on the part of Khajavi. In other words, it is Feather River's position that it had good cause to terminate Khajavi's employment contract and therefore, cannot be found liable for breach of said employment contract."

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 [34 Cal.Rptr.2d 607, 882 P.2d 298].)

Here, however, Feather River was not entitled to the instruction because BAJI No. 10.37 is designed for wrongful termination claims based on an implied contract, and Khajavi's employment contract was a contract for a specified term.[13]

The Court of Appeal in *Pugh v. See's Candies, Inc.* (1981) 116 Cal.App.3d 311, 330 [171 Cal.Rptr. 917]—"the font of implied-contract-based wrongful termination law in California" (*Cotran v. Rollins Hudig Hall Internat., Inc.* (1998) 17 Cal.4th 93, 96 [69 Cal.Rptr.2d 900, 948 P.2d 412])—observed that "good cause" in the context of wrongful termination based on an implied contract "is quite different from the standard applicable in determining the propriety of an employee's termination under a contract for a specified term. (Cf. Lab. Code, § 2924.)"

---

[12]The trial court did, however, instruct the jury with BAJI Nos. 10.31 and 10.32, which concern termination of an employment agreement for a specified term. BAJI No. 10.31 provides in part that "[a]n employer may not legally terminate an employee hired under an employment contract for a specified term prior to expiration of the term of the contract, unless the employer has good cause for doing so," and BAJI No. 10.32 provides that "[g]ood cause . . . exists when there is a willful breach of duty by the employee in the course of employment . . . ."

[13]At trial, Richard Del Pero and Henderson testified that the contract was for a specified term, and Feather River does not dispute this point. However, there was conflicting evidence concerning whether the term was one or two years.

Employment for a specified term is governed by Labor Code section 2924. It provides: "An employment for a specified term may be terminated at any time by the employer in case of any willful breach of duty by the employee in the course of his employment, or in case of his habitual neglect of his duty or continued incapacity to perform it."

In construing a statute, as mentioned earlier, "a court begins with the words of the statute, because they generally provide the most reliable indicator of legislative intent." (*Hsu v. Abbara, supra,* 9 Cal.4th at p. 871.)

The plain language of this statute—that an employment contract for a specified term may be terminated for a "willful breach of duty," a "habitual neglect of duty," or a "continued incapacity to perform"—would not appear to allow termination for an honest but mistaken belief that discharge was required. Such a termination would not be based on a willful breach of duty, a habitual neglect of duty, or a continued incapacity to perform.[14]

Indeed, Labor Code section 2924 has traditionally been interpreted to "inhibit[] the termination of employment for a specified term except in case of a wilful breach of duty, of habitual neglect of, or continued incapacity to perform, a duty." (*Canavan v. College of Osteopathic P. & S.* (1946) 73 Cal.App.2d 511, 521 [166 P.2d 878]; accord, *Holtzendorff v. Housing Authority* (1967) 250 Cal.App.2d 596, 610, 614 [58 Cal.Rptr. 886]; see *Ehlers v. Langley & Michaels Co.* (1925) 72 Cal.App. 214, 221 [237 P. 55].)

A contrary interpretation—that an employee with a specified term of employment could be terminated for the mistaken, but honest belief that the employee had breached his or her duty—would run counter to the concept of employment for a specified term. Such a right would treat a contract with a specified term no better than an implied contract that has no term. Such a right would dilute the enforceability of the contract's specified term because an employee who properly performed the contract could be terminated before the end of its term. What would be the benefit of a specified term if the employee could be discharged prior to the end of that term, notwithstanding the employee's compliance with the contract's provisions?

Significantly, the authorities upon which Feather River relies in support of its request for the instruction, expressly limit their analyses to implied-employment agreements. (*Cotran v. Rollins Hudig Hall Internat., Inc., supra,*

---

[14]This appeal does not present, and we therefore do not address, the issue whether the express terms of the contract could provide for another basis for termination, or conversely, modify one of the statutory grounds.

17 Cal.4th 93, 95-96, & fn. 1; *Fowler v. Varian Associates, Inc.* (1987) 196 Cal.App.3d 34, 40-41 [241 Cal.Rptr. 539].) The implied-employment agreement implies a promise to refrain from arbitrary dismissal. (See *Pugh v. See's Candies, Inc., supra,* 116 Cal.App.3d at p. 329; *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 676, 679 [254 Cal.Rptr. 211, 765 P.2d 373].) By reason of such an implied promise to refrain from arbitrary dismissal, cause for termination only requires "fair and honest reasons, regulated by good faith on the part of the employer, that are not trivial, arbitrary or capricious, unrelated to business needs or goals, or pretextual." (*Cotran v. Rollins Hudig Hall Internat., Inc., supra,* 17 Cal.4th at p. 108.) Such implied contracts, which have no statutory basis but are "largely a creature of the common law" (*Ibid.*), differ from employment contracts for a specified term, in which the right to terminate is defined by statute and the express terms of the agreement.

Appellate authority agrees that "good cause" in the context of at-will employment differs from "good cause" for termination of a contract for a specified term. (E.g., *Stokes v. Dole Nut Co.* (1995) 41 Cal.App.4th 285, 293 [48 Cal.Rptr.2d 673] [" ' "Good cause" ' " in the context of at-will employment " 'is quite different from the standard applicable in determining the propriety of an employee's termination under a contract for a specified term' "]; *Koehrer v. Superior Court* (1986) 181 Cal.App.3d 1155, 1163-1164 [226 Cal.Rptr. 820] ["An important historical fact in the development of this area of the law lies in the differences in the rights, duties and remedies of the employer and employee where the employment contract is for a specified term and where the contract is for an indeterminate time ('at will')"], disapproved on other grounds in *Foley v. Interactive Data Corp., supra,* 47 Cal.3d at pp. 697-700 & fn. 42, and in *Gantt v. Sentry Insurance, supra,* 1 Cal.4th at pp. 1093-1095; *Pugh v. See's Candies, Inc., supra,* 116 Cal.App.3d at p. 330.)

Finally, the California Supreme Court in *Cotran v. Rollins Hudig Hall Internat., Inc., supra,* 17 Cal.4th at page 96, footnote 1, which defined the standard for a good-cause termination in the context of an implied-in-fact employment contract, acknowledged that "[w]rongful termination claims founded on an *explicit* promise that termination will not occur except for just or good cause may call for a different standard, depending upon the precise terms of the contract provision."

Since Khajavi's claim was not based on an implied employment contract, but on an employment contract for a specified term, his claim is subject to Labor Code section 2924. And that statute does not grant a right to terminate

prior to the end of the employee's term on the basis of a mistaken belief of a breach. Indeed, even the comment to the instruction that Feather River requested—BAJI No. 10.37—suggests that the instruction is appropriate when damages are sought for a violation of the implied covenant of good faith and fair dealing. (See Com. to BAJI No. 10.37 (8th ed. 1998) p. 533.)

Accordingly, Feather River was not entitled to the defense embodied in BAJI No. 10.37 in an action based upon an employment contract for a specified term.

III. *Khajavi's Appeal from the Denial of Attorney Fees*

Following the verdict, Khajavi filed a motion seeking attorney fees as an element of costs. The trial court denied the motion.

 The determination of whether there exists a "legal basis for an award of attorney fees is a question of law which we review de novo" where the facts are undisputed. (*Honey Baked Hams, Inc. v. Dickens* (1995) 37 Cal.App.4th 421, 424 [43 Cal.Rptr.2d 595], disapproved on another ground in *Santisas v. Goodin* (1998) 17 Cal.4th 599, 614, fn. 8 [71 Cal.Rptr.2d 830, 951 P.2d 399].)

 In this case, there was no direct evidence that Khajavi's oral employment agreement included an attorney fees provision. Khajavi nonetheless argues that he, Bains, and Mathieson "were hired pursuant to the same oral agreement," that "Bains['s] and Mathieson's [subsequent] written contracts [were] the memorialization of the oral agreement," that "the Bains and Mathieson contracts contain an attorney's fees provision," and thus, "it is only logical and . . . irrefutable . . . that [his] contract also included an attorney's fee provision."

In fact, in April 1996, after Feather River had decided to end Khajavi's employment, it entered into written employment contracts with both Bains and Mathieson. Although actually executed in the spring of 1996, the written contracts with Bains and Mathieson stated that the agreements were made on September 30, 1995, and that they were for a term of one year, terminating on September 30, 1996, with the possibility of renewal. The written contracts contained an attorney fees clause. Bains testified that the written contract was "consistent" with the compensation plan orally described to him by Feather River in September 1995; Mathieson testified that the written contract "mirrored what had been agreed to from the initial time that [he had been] hired as an employee."

Accordingly, Khajavi's argument is that he is entitled to the benefit of the same provisions placed in his coemployees' subsequent written agreements, even though he did not enter into one, and even though his oral agreement did not include any such provision. As a matter of contract law, a party is entitled to the benefit of only those provisions to which the contracting parties agreed, not the ones to which they might have subsequently agreed.

"One of the essential elements of a contract is the consent of the parties. (Civ. Code, § 1550.) This consent must be mutual. (Civ. Code, § 1565.) 'Consent is not mutual, unless the parties all agree upon the same thing in the same sense.' (Civ. Code, § 1580.) It is only on evidence of such consent that the law enforces the terms of a contract or gives a remedy for the breach of it. One cannot be made to stand on a contract to which he has never consented." (*Amer. Aero. Corp. v. Grand Cen. Aircraft Co.* (1957) 155 Cal.App.2d 69, 79 [317 P.2d 694].)[15]

In this case, there was no mutual consent as to an attorney fees provision with respect to Khajavi's contract: The parties had never discussed it, let alone agreed to it.

Admittedly, Khajavi's colleagues, who had entered similar oral employment agreements, ended up with written agreements that included an attorney fees clause. ■■■ But the fact that their subsequent written contracts included additional clauses did not enlarge their earlier oral agreement—until such time both parties had agreed to those additional clauses: "Where a person offers to do a definite thing and another introduces a new term into the acceptance, his answer is a mere expression of willingness to treat or it is a counter-proposal, and in neither case is there a contract; if it is a new proposal and it is not accepted it amounts to nothing." (*Amer. Aero. Corp. v. Grand Cen. Aircraft Co., supra,* 155 Cal.App.2d at p. 80.)

*Amer. Aero. Corp. v. Grand Cen. Aircraft Co., supra,* 155 Cal.App.2d 69, is on point. There, American Aeronautics admitted that it had entered an oral agreement with Grand Central Aircraft to reconstruct and assemble two aircraft, but refused to execute the written agreement to which the oral agreement had been reduced on the ground that it failed to conform to the oral agreement. Among the issues on appeal was the propriety of an award of attorney fees to Grand Central Aircraft on the ground that the "complete terms of the oral agreement [were] to be found in the proposed written

---

[15]A separate point made in *Amer. Aero. Corp. v. Grand Cen. Aircraft Co., supra,* 155 Cal.App.2d 69, concerning partial nonsuits has been superseded by statute. (See *Beavers v. Allstate Ins. Co.* (1990) 225 Cal.App.3d 310, 324-325 [274 Cal.Rptr. 766].)

contract," which included an attorney fees provision. (155 Cal.App.2d at p. 78.) The Court of Appeal found that the evidence did not "support the finding that each of the parties accepted and approved the proposed written contract as containing the oral agreement." (*Id.* at p. 79.) It concluded that the attorney fees provision in the proposed written contract could not be given effect because the written agreement had never taken effect: ". . . insofar as the proposed written contract is concerned two of the necessary elements of a valid contract are lacking. There was no mutual assent and there was no delivery. It was part of the understanding of the parties that their oral agreement should be reduced to writing, signed by them, and delivered. The oral agreement, as made, was not reduced to writing. New terms were added in the writing, and it was never signed by American or delivered. The result was that the oral agreement remained binding [citations], and the proposed written contract was of no force or effect." (*Id.* at pp. 82-83.)

 Likewise, here, there was no mutual assent and no delivery of the written contract. New terms were included in the writing, but it was never signed by or delivered to Khajavi.

Khajavi complains that "the only reason he was not able to present a written agreement with an express attorneys' fees clause, is that defendant breached its contract with [him] before it fulfilled its commitment to provide him with a written agreement." However, Khajavi's contractual right to attorney fees must come from the agreement that was entered and was breached, not an unknown one that might have been entered had there been no breach. Khajavi's argument sounds more in estoppel, but he makes no such argument on appeal. Nor could he, since he fails to present any evidence upon which an estoppel could be based. (See 11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, §§ 176, 177, pp. 858-860 [defining estoppel].)

The fact that the parties made an oral agreement with the expectation that a written agreement would follow does not transform an unseen, unsigned, and undelivered written document into a contract. Where parties reach an oral agreement with the expectation that a written agreement will follow, two possibilities exist: Negotiations can result in a binding oral contract "when all of the terms are definitely understood, even though the parties intend to later execute a formal writing." (*Louis Lesser Enterprises, Ltd. v. Roeder* (1962) 209 Cal.App.2d 401, 404-405 [25 Cal.Rptr. 917]; accord, *Schwartz v. Shapiro* (1964) 229 Cal.App.2d 238, 247 [40 Cal.Rptr. 189].) Alternatively, "where the parties understood that the proposed agreement is

not complete until reduced to formal writing and signed, no binding contract results until this is done." (*Louis Lesser Enterprises, Ltd. v. Roeder, supra,* 209 Cal.App.2d at p. 405; accord, *Amer. Aero. Corp. v. Grand Cen. Aircraft Co., supra,* 155 Cal.App.2d at p. 80.) Had the latter alternative been the case, of course, Khajavi could not have sued upon the oral agreement.

Instead, relying on the first alternative, he sued on the basis of the oral agreement on the ground that it represented the agreement of the parties, despite the expectation that a written agreement would follow. However, under that alternative, Khajavi is limited to the terms of the oral agreement. The terms of a subsequent writing may evidence the terms of the oral agreement (*Schwartz v. Shapiro, supra,* 229 Cal.App.2d at p. 248), but cannot enlarge them.

Yet, Khajavi has failed to establish that his oral employment agreement contained a provision for attorney fees. Not only was no direct evidence introduced to establish that Khajavi's oral employment agreement contained an attorney fees provision, but the circumstantial evidence likewise failed to do so. Even assuming that Khajavi's oral employment agreement was identical to Feather River's oral agreements with Bains and Mathieson, the evidence adduced at trial did not establish that the written contracts later executed by Feather River with Bains and Mathieson were identical in every respect to the previous oral agreements; it only established that the written contracts reflected the major components—compensation, benefits, and duration—of the September 1995 oral agreements.

Indeed, not unexpectedly, the written contracts—nine pages including exhibits—contained many provisions that no one testified were included in the oral agreements. For example, the written contracts contained detailed provisions regarding the circumstances under which the contracts could be terminated, including a requirement of written notice prior to termination. Khajavi cannot have the benefit of some of the provisions in the written contracts without taking the others.

Accordingly, Khajavi's contract claim for attorney fees fails because his oral agreement did not include any attorney fees provision. ▮ "In the absence of a statute authorizing attorneys' fees as an element of damages, or of a contract to pay such fees in event of the party's recovery, attorneys' fees paid by a successful party in an action are never recoverable against the unsuccessful party." (*Amer. Aero. Corp. v. Grand Cen. Aircraft Co., supra,* 155 Cal.App.2d at p. 83; *Jen-Mar Constr. Co. v. Brown* (1967)

247 Cal.App.2d 564, 573 [55 Cal.Rptr. 832]; Code Civ. Proc., § 1021.)[16]
 The court did not err in denying Khajavi's claim for attorney fees.

### DISPOSITION

The nonsuit in favor of Feather River on the fourth cause of action of the complaint is reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion. In all other respects, the judgment is affirmed. Khajavi is awarded his costs on appeal against Feather River in appeal Case Nos. C029159 and C029276; Feather River is awarded its costs on appeal against Khajavi in appeal Case No. C030087; and Robert Del Pero is awarded his costs on appeal against Khajavi in case No. C029159. (See Cal. Rules of Court, rule 26(a).)

Scotland, P. J., and Davis, J., concurred.

A petition for a rehearing was denied November 3, 2000, and the petition of respondent Feather River Amnesia Medical Group for review by the Supreme Court was denied January 24, 2001.

---

[16]Notwithstanding Khajavi's contention to the contrary, Civil Code section 1717 does not apply here because it only comes into play where a contract specifically provides for attorney fees. "The primary purpose of [Civil Code] section 1717 is to ensure mutuality of remedy for attorney fee claims under contractual attorney fee provisions." (*Santisas v. Goodin, supra,* 17 Cal.4th at p. 610.) It cannot be bootstrapped to provide for attorney fees for breach of a contract that has no attorney fees provision.