Filed 8/1/13  San Diego Hosp. Based Physicians v. El Centro Reg. Med. Center CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO HOSPITAL BASED PHYSICIANS et al., | D061740 |
| Plaintiffs and Respondents, | |
| v. | (Super. Ct. No. ECU06760) |
| EL CENTRO REGIONAL MEDICAL CENTER, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Imperial County, Jeffrey B. Jones, Judge.  Affirmed.

Dicaro, Coppo & Popcke, Carlo Coppo, Michael R. Popcke and Shelley A. Carder for Defendant and Appellant.

The Mathews Law Group, Charles T. Mathews, George S. Azadian, Zack I. Domb, Jeffrey Nakao; Pine & Pine, Norman Pine and Janet Gusdorff for Plaintiffs and Respondents.

San Diego Hospital Based Physicians (SDHBP) and its two owners, Dr. Maria Ramirez and Dr. Dalia Strauser, (collectively plaintiffs) sued El Centro Regional Medical Center (the Hospital), alleging the Hospital retaliated against plaintiffs for complaining about patient care practices and breached numerous provisions of the parties' agreement. Plaintiffs' complaint asserted statutory and contract claims. Shortly after, the Hospital moved to dismiss the complaint under the anti-SLAPP statute. (Code Civ. Proc., § 425.16 (§ 425.16).) The court denied the motion, finding plaintiffs' claims were not governed by this statute.

We affirm, although for different reasons. We determine plaintiffs' statutory retaliation claims against the Hospital are subject to the anti-SLAPP statute, but plaintiffs met their burden to show a probability of prevailing on each of the causes of action. We conclude plaintiffs' contract claims are not subject to the anti-SLAPP statutes and in any event plaintiffs showed a probability of prevailing on the merits of these claims.

FACTUAL AND PROCEDURAL SUMMARY

*Factual Summary*

We state the facts in the light most favorable to plaintiffs, the parties opposing the anti-SLAPP motion. (See *Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.)

The Hospital is a municipal agency owned by the City of El Centro and is governed by a seven-person Board of Trustees (Board). The Board members are appointed by El Centro's mayor with the consent of the city council.

2

SDHBP is an entity that provides hospitalist personnel and services. Hospitalists are generally internal medicine doctors who treat hospitalized patients to ensure they receive proper care, including diagnosis and appropriate specialty referrals. SDHBP is owned by Dr. Strauser and Dr. Ramirez, who both specialize in internal medicine and hospital medicine. Dr. Strauser has practiced medicine for more than 20 years and Dr. Ramirez has practiced medicine for more than 15 years.

In July 2009, the Hospital entered into a contract with SDHBP in which SDHBP agreed to provide hospitalist services for unassigned patients (patients who do not have a personal physician). Under the contract, SDHBP was responsible for providing the services of nine hospitalist physicians, including Dr. Ramirez and Dr. Strauser. About one year later, Hospital officials praised SDHBP's work and presented statistics showing that SDHBP had reduced mortality rates and average Hospital lengths of stay. Hospital administrator Tomas Virgen said that " 'nobody works as hard' " as Dr. Strauser and Dr. Ramirez, and that they " 'raised the bar for patient care.' " Virgen also said that Dr. Ramirez and Dr. Strauser "were the reason why [patient care had] improved so much [at the Hospital]."

When their first contract expired in late June 2010, the Hospital and SDHBP entered into a new contract for hospitalist services (Amended Agreement). The Amended Agreement was for a two-year term with extensions by the parties' agreement. The Amended Agreement provided that *after* the "Initial Term" (defined as July 1, 2010 through June 30, 2012) either party "may, in its sole discretion, terminate this Agreement without cause by giving the other party at least ninety (90) days' prior written notice."

The Amended Agreement further provided that either party could terminate the agreement for a material breach "provided such breach continues for fifteen (15) days after receipt by the breaching party of written notice of such breach from the non-breaching party." The Amended Agreement additionally provided that the Hospital could terminate the contract "immediately by written notice" upon the occurrence of certain specific events.

Less than two months after the parties entered into the Amended Agreement, in August 2010, the Hospital hired Team Health, Inc. to manage and operate the Hospital's emergency department. Shortly after, SDHBP became concerned about Team Health's practices and the nature of the contract between the Hospital and Team Health, which SDHBP believed negatively affected patient care. SDHBP doctors found that Team Health physicians frequently admitted patients into the Hospital (or sought to compel SDHBP physicians to do so) despite the fact that these patients were not properly stabilized, diagnosed, or treated in the emergency room and/or that they should have been transferred to other hospitals with available surgeons and/or necessary medical equipment.

Shortly after, Dr. Ramirez and Dr. Strauser reported to Hospital administrators "at the highest levels" their concerns about patient care arising from Team Health practices and operations. The doctors identified approximately 35 specific cases of inadequate patient care.

On November 22, 2010, SDHBP sent an email to Dr. George Hancock, the Hospital's chief of medicine (who became medical chief of staff on January 1, 2011),

4

detailing 19 separate cases in which Team Health and Hospital practices allegedly negatively affected patient care in a substantial manner. SDHBP did not provide any patient-identifying information, but briefly described each situation and explained the perceived problem with the medical treatment. SDHBP also sent the email to several other Hospital officials, including the Board president, the Hospital's chief of staff, and the Hospital's quality committee chair.

Shortly after, Dr. Hancock dismissed all of the complaints as being " 'unsubstantiated,' " despite the fact that he had access to patient charts that would have supported SDHBP's claims.

About one month later, on December 20, 2010 and December 28, 2010, Dr. Ramirez and Dr. Strauser sent two lengthy emails complaining about Team Health's policies and practices and asserting that these practices were hindering SDHBP's work and detrimentally affecting patient care. Plaintiffs sent the emails to various Hospital officials, including David Green, the Hospital's chief executive officer (CEO); Virgen, the chief of physician relations; and Debra Driskill, the Board's quality committee chair.

At a meeting held shortly after, on January 3, 2011, Dr. Hancock reneged on a prior agreement to appoint (or recommend for appointment) Dr. Strauser as vice-chief of medicine. During the same January 3 meeting, Dr. Hancock said to Dr. Strauser, " 'I will walk out of this meeting if you make another complaint regarding patient care.' "

Two days later, on January 5, the Hospital's peer review committee, known as the Medical Executive Committee (MEC), sent written notices to Dr. Ramirez and Dr. Strauser stating that it had "initiated an investigation regarding your communication . . .

5

to parties outside the acceptable channels . . . ."  The notices were signed by Dr. Hancock as MEC chair.  The notices stated that the MEC would be investigating whether the doctors' two December emails:  (1) violate rules requiring medical staff members to work together "in a cooperative professional, non-disruptive manner"; (2) violate confidentiality rules; and (3) constitute "unauthorized peer review" outside of organized medical staff procedures.  The notices concluded:  "We will inform you of the outcome of this investigation and our recommendations for appropriate corrective action.  You will be given an opportunity to provide information in a manner and upon such terms as we deem appropriate before our final action.  If this action constitutes grounds for hearing, you will be so informed at the appropriate time."

Shortly after, Dr. Hancock told Dr. Strauser and Dr. Ramirez that they should not complain in emails because " 'the Feds would have access to those emails.' "  Dr. Ramirez and Dr. Strauser were instructed to use specific " 'Q&A forms' " to document claims of inadequate patient care.

During the next several months, Dr. Ramirez and Dr. Strauser completed approximately 12 Q&A forms describing specific patient care issues and they submitted the forms to the assigned Hospital employee, Andrea Hammond.  However, Hammond never responded to these complaints.  Hospital official Virgen told Dr. Ramirez and Dr. Strauser that " 'the stack of complaints is on Andrea Hammond's desk but nothing will ever be investigated.' "

On March 22, 2011, the Hospital's Board held its monthly public meeting.  During a closed (nonpublic) portion of this meeting, the Board voted to terminate the Amended

6

Agreement "without cause." The official meeting minutes state that the Board unanimously "[a]pproved [a] 90 Day Notice of Termination of Agreement with [SDHBP]."

The next day, on March 23, Hospital CEO Green told Dr. Ramirez and Dr. Strauser that the Board had decided to terminate SDHBP's Agreement "and that the contract had *already* been terminated." (Italics added.) Green said the Board had made this decision because Dr. Ramirez and Dr. Strauser did not " 'know how to play nice in the sandbox.' " When they asked what Green meant, he referred to their complaints regarding inadequate patient care by the Hospital and Team Health. Dr. Ramirez and Dr. Strauser asked whether there was anything they "could do to remedy the situation," and Green said " 'no, the decision has already been made to terminate the contract.' " Green also said that Dr. Ramirez and Dr. Strauser had the option "to resign or be fired."

Later that morning Hospital official Virgen told Steven Ramirez (SDHBP's chief financial officer (CFO)) that the Amended Agreement "had *already* been terminated." (Italics added.) Virgen also told Ramirez that " 'if SDHBP, Dr. Strauser, and Dr. Ramirez did not resign, they would be fired.' " Virgen said these doctors "would have to resign in writing if they did not want to be fired."

Fearing the risks to SDHBP and to Dr. Ramirez and Dr. Strauser, CFO Ramirez "panicked" and immediately sent a letter addressed to Hospital CEO Green, stating " '[b]ased on recent discussion with you and the decision of the Board . . . , we agree to resign from our hospitalist service at [the Hospital].' " The letter contained spaces for the signatures of Dr. Strauser and Dr. Ramirez. There is a factual issue regarding whether

7

the two doctors signed this letter before it was sent to the Hospital. In their declarations, Dr. Ramirez and Dr. Strauser said they did not sign the letter and did not want to resign or terminate the Amended Agreement.

Two days later, on March 25, Hospital CEO Green sent a letter to Dr. Ramirez and Dr. Strauser, stating: "This letter follows-up on our conversations and correspondence over this past week during which we mutually agreed to terminate the Agreement. To confirm the foregoing, we have signed below and request that you also sign the enclosed copy of this letter and return the same to us at your earliest convenience. . . . [¶] By signing this letter [Hospital] hereby mutually agrees with [SDHBP] to agree to terminate the Agreement effective as of June 30, 2011, notwithstanding the provisions thereof." Dr. Ramirez and Dr. Strauser refused to sign this letter because they did not wish to resign.

When Dr. Strauser asked Hospital official Virgen why the Amended Agreement was terminated, he said " 'you turned on the light and all the cockroaches ran away scared.' " During the next several months, Dr. Strauser and Dr. Ramirez continued working at the Hospital until the end of June 2011. On July 1, 2011, their membership and privileges on the Hospital's medical staff expired, and they did not reapply to continue practicing at the Hospital.[1]

---

[1]     Under the Hospital bylaws, a physician with staff privileges must submit an application for reappointment every two years.

*Complaint and Anti-SLAPP Motion*

Several months later, plaintiffs filed their lawsuit against the Hospital and Team Health.[2]  Plaintiffs alleged five causes of action against the Hospital.  In the first three, plaintiffs alleged the Hospital violated statutes prohibiting retaliation against physicians for complaining about, or advocating for, patient care.  (Health & Saf. Code, § 1278.5; Bus. & Prof. Code, §§ 2056, 510.)  In the remaining two claims, plaintiffs alleged the Hospital's conduct constituted a breach of the Amended Agreement and a breach of the implied covenant of good faith and fair dealing.

Shortly after, the Hospital moved to strike the complaint under the anti-SLAPP statute.  (§ 425.16.)  The Hospital argued that plaintiffs' complaint arose from constitutionally protected activity because it was based on the Board's contract termination decision, which it said was a "quasi-legislative" act made at an "official proceeding."  (See § 425.16, subd. (e)(2).)  With respect to the merits of plaintiffs' statutory retaliation claims, the Hospital argued that plaintiffs would be unable to prove their claims because the Hospital's decision to terminate the contract without cause was "quasi-legislative" and thus entitled to substantial deference.  The Hospital asserted that its termination decision "involved managerial and policy issues relating to the general management of the hospital's business" and "did *not* involve" a peer review determination by the medical staff.  (Italics added.)  On plaintiffs' contract claims, the Hospital argued primarily that the decision to terminate was mutual and thus no breach could be proven.

_____

2      Team Health did not file an anti-SLAPP motion and is not a party to this appeal. We thus omit further discussion of plaintiffs' claims against Team Health.

9

In support of its anti-SLAPP motion, the Hospital submitted declarations of Dr. Hancock (the Hospital's chief of medical staff), CEO Green, and Hospital official Virgen.

Dr. Hancock stated in relevant part: "I can state with certainty, that the Medical Staff membership and privileges of both [Dr. Strauser and Dr. Ramirez] were unaffected by the termination of the agreement between [Hospital and SDHBP]. Both retained their membership and privileges and remained able to admit and care for patients at [the Hospital]." But Dr. Hancock also claimed that various actions taken by Dr. Ramirez and Dr. Strauser violated applicable rules and standards. He also discussed at length the reasons that the Board terminated the Amended Agreement, including that Hospital resources were improperly diverted to the need to "educate [the two physicians] regarding the real and potential harm they were causing" by sending the detailed patient-care complaint emails, and that the emails reflected only plaintiffs' attempt to "minimize their own obligations and duties" and to "limit their responsibilities."

In his declaration, CEO Green confirmed that the Board "voted to terminate the [Amended Agreement] *without cause*" and that this decision "had no effect on the membership and [medical staff] privileges enjoyed by" Dr. Ramirez and Dr. Strauser. (Italics added.) Green explained that the termination decision was "undertaken . . . to improve the cost-effective and smooth running of the organization" and that the decision "involved managerial and policy issues relating to the general management of the hospital's business." Green said the termination was a "business decision . . . which we believed would be in the best interests of [the Hospital] and its patients." However, Green also identified numerous "deficiencies" in the services provided by Dr. Ramirez

10

and Dr. Strauser and stated that "SDHBP's failure to fulfill its obligations under the Amended Agreement impeded [Hospital's] obligation to provide high quality patient care." Green also claimed that Dr. Ramirez "and/or" Dr. Strauser orally "confirmed their voluntary agreement to mutually terminate the Amended Agreement."

In his declaration, Hospital administrator Virgen stated that Dr. Ramirez and Dr. Strauser were constantly "disruptive" and that between 2009 and 2011, he was required to devote "an increasing percentage of [his] work time" in "dealing with hospitalist issues" that were "burdensome and drained resources from the hospital . . . ." Virgen also stated that the Board terminated the Amended Agreement because the Hospital made the "managerial" decision that SDHBP's services were "impeding the efficient and smooth management" of the hospital. Virgen also repeated statements by Dr. Hancock and CEO Green that the termination of the Amended Agreement "had no effect on the individual physicians providing care and treatment pursuant to the Amended Agreement, including the Plaintiff physicians. Each physician remained on the Medical Staff, with their established privileges."

In opposition to the Hospital's anti-SLAPP motion, plaintiffs argued their claims did not arise from the Hospital's constitutionally protected speech or conduct, and instead concerned only the improper termination of the Amended Agreement and the Hospital's retaliatory actions in response to plaintiffs' complaints about patient care. Plaintiffs submitted their lengthy supporting declarations, in which they disputed each of the Hospital's allegations that they breached the Amended Agreement and/or that they were unnecessarily disruptive of Hospital services. In this regard, they explained in detail the

11

distinction between the duties of an emergency room doctor and a hospitalist, and claimed that Team Health's emergency room services were substantially deficient and detrimentally affected patient care and their own ability to perform under the Amended Agreement. They asserted that in their December 20 and 28 emails, they "demanded that [the Hospital] take immediate action to stop the inadequate patient care delivered by Team Health" and identified the specific nature of their complaints regarding patient care.

Dr. Ramirez and Dr. Strauser also stated that they distributed their December 2010 emails only to appropriate Hospital personnel and did not disclose any patient identifying information that would breach privacy laws. They further discussed the various actions taken against them for asserting their complaints, including the implementation of policies prohibiting the emergency room doctors from writing "holding orders" and the policy pertaining to the pronouncement of death for do-not-resuscitate patients. They stated that they "refused to resign . . . to expose the life-threatening care that [was] resulting in needless deaths and suffering." They denied signing the March 25 letter sent by SDHBP's CFO, and stated that they "did not want to resign and wanted to help the patients at [the Hospital] receive the adequate care they deserved."

In their reply papers, the Hospital claimed for the first time that plaintiffs' claims were barred by the administrative and judicial exhaustion doctrines. The Hospital also submitted Green's supplemental declaration, stating in relevant part: "The Board . . . was made aware corrective action had been initiated [by the Hospital's peer review board] against Plaintiffs and if a termination 'for cause' was sought, rather than a termination 'without cause' under the Agreement, the [H]ospital would face certain costs as well as

12

the potential for litigation.  Facing such potential litigation, it was the recommendation of the [Hospital] administration that seeking a termination of the Agreement, without cause, would be the most efficient and reasonable option.  The Board . . . voted to follow this recommendation after deliberation of the issue on March 22, 2011."

*Court's Order*

After a hearing, the court denied Hospital's anti-SLAPP motion, concluding that the Hospital did not meet its burden to show plaintiffs' claims arose out of constitutionally protected activity under section 425.16.  The court found the gravamen of the complaint did not arise from the peer review process or any other constitutionally protected activity, and instead arose from a policy or business decision by the Board to terminate the contract.  The court thus did not reach the issue whether plaintiffs met their burden to show a probability of prevailing on their claims.

DISCUSSION

I. *Generally Applicable Legal Principles*

Section 425.16 (the anti-SLAPP statute) states:  "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."  (§ 425.16, subd. (b)(1).)  The Legislature has mandated that courts construe this statute "broadly" in favor of the moving party. (§ 425.16, subd. (a).)

13

The analysis of an anti-SLAPP motion involves two steps.

First, the defendant has the burden to show the defendant's allegedly wrongful conduct was "*in furtherance of*" its free speech or petition rights and that the cause of action *arose* from this protected conduct. (§ 425.16, subd. (b)(1), italics added.) The anti-SLAPP statute identifies four categories of actions that are "in furtherance of" a defendant's free speech or petition rights. (§ 425.16, subd. (e); see *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78.) In the proceedings below, the Hospital relied solely on the second statutory category to show its alleged wrongful acts were in furtherance of its constitutional rights: "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law." (§ 425.16, subd. (e)(2).)

In determining whether a claim *arises* from the protected activity, a court must "disregard the labeling of the claim . . . and instead 'examine the *principal thrust* or *gravamen* of a plaintiff's cause of action to determine whether the anti-SLAPP statute applies' and whether the trial court correctly ruled on the anti-SLAPP motion. [Citation.] We assess the principal thrust by identifying '*[t]he allegedly wrongful and injury-producing conduct . . .* that provides the foundation for the claim.' [Citation.]" (*Hylton v. Frank E. Rogozienski, Inc.* (2009) 177 Cal.App.4th 1264, 1271-1272, italics added; see also *Tuszynska v. Cunningham* (2011) 199 Cal.App.4th 257, 269-270.) "The anti-SLAPP statute's definitional focus is [on] the defendant's *activity* that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 92.)

14

If the court finds the defendant met its burden to show the cause of action arose from protected activity, it then must proceed to the second step of the analysis: whether the plaintiff has established a probability of prevailing on the claim. In this step, the burden shifts to the plaintiff to " ' "demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' " (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820 (*Oasis West*); *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1010 (*ComputerXpress*.) " 'Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute.' " (*Oasis West, supra*, 51 Cal.4th at p. 820.)

We review a trial court's anti-SLAPP order de novo. "We consider 'the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based.' (§ 425.16, subd. (b)(2).) However, we neither 'weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law.' [Citation.]" (*Soukup, supra*, 39 Cal.4th at p. 269, fn. 3.) We are not bound by the court's findings and conduct an independent review of the entire record. (*Ibid*.) "If the trial court's decision is correct on any theory applicable to the case, we affirm the order regardless of the correctness of the grounds on which the lower court reached its conclusion." (*Robles v. Chalilpoyil* (2010) 181 Cal.App.4th 566, 573.)

15

Under these principles, we examine the Hospital's contentions that the court erred in refusing to strike: (1) plaintiffs' statutory retaliation claims; (2) plaintiffs' contract claim; and (3) plaintiffs' claim for breach of the implied covenant of good faith and fair dealing.

## II. *Retaliation Claims*

### A. *First Step: Protected Activity*

In their complaint, plaintiffs alleged the Hospital engaged in retaliatory actions in violation of three statutes: Health and Safety Code section 1278.5, Business and Professions Code section 510, and Business and Professions Code section 2056.

Health and Safety Code section 1278.5 states: "No health facility shall . . . retaliate, in any manner, against any . . . member of the medical staff . . . because that person has . . . [¶] . . . [p]resented a grievance, complaint, or report to the facility . . . or the medical staff of the facility, or to any other governmental entity." Business and Professions Code sections 2056 and 510 prohibit parties from terminating a contractual relationship with a physician in retaliation for the physician's advocating for medically appropriate health care on behalf of a patient.

In their causes of action under these statutes, plaintiffs alleged the Hospital engaged in several distinct retaliatory actions after plaintiffs complained about the Hospital's substandard health care practices. These retaliatory actions included: (1) the Hospital's implementing a policy prohibiting emergency room doctors from writing holding orders on patients being admitted to the hospital, allegedly making it "impossible" for SDHBP to properly perform its work and fulfill the requirements of the

16

Amended Agreement; (2) the Hospital's implementing a policy regarding "do-not-resuscitate" patients for the "sole purpose of making the SDHBP hospitalists' job unbearable"; (3) the Hospital's peer review committee's January 5, 2011 letter to Dr. Ramirez and Dr. Strauser, notifying them of the commencement of a peer review investigation based on their alleged improper communications concerning patient care; (4) the Board's March 22 "no-cause" termination of the Amended Agreement; (5) statements by Hospital officials that based on the Board vote, Dr. Ramirez and Dr. Strauser had " 'already' " been terminated but also had the option to "resign or be fired"; and (6) CEO Hancock's withdrawing his offer of a vice-chief position to Dr. Strauser.

The third allegation above—that the Hospital unlawfully retaliated against plaintiffs by *initiating* a peer review investigation—clearly arises from protected activity. Under section 425.16, subdivision (e)(2), the anti-SLAPP statute applies to a cause of action arising from "any written or oral statement or writing made in connection with an issue under consideration or review by . . . [an] official proceeding authorized by law." The California Supreme Court has held a hospital peer review proceeding qualifies as an " 'official proceeding authorized by law' " under this subdivision. (*Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, 199 (*Kibler*).) In their complaint, plaintiffs alleged that the Hospital's peer review committee (the MEC) sent the January 5, 2011 letter notifying plaintiffs of the initiation of a peer review investigation *in retaliation* for their expressing concerns about substandard patient care at the Hospital. This allegation of wrongful conduct is based on the Hospital's "writing made in connection with an issue under consideration or review" by an official proceeding (the

17

peer review proceeding) and thus arises from protected activities within the meaning of the anti-SLAPP statute. (§ 425.16, subd. (e)(2).)

Plaintiffs argue that even if this allegation arose from protected activity, "it is only one of five alleged separate retaliatory acts, and does not transform the gravamen or principal thrust of the statutory retaliation claims into one arising from peer review." (Italics omitted.)

We agree that several of the Hospital's other alleged retaliatory actions did not arise from the Hospital's constitutionally protected activity. However, where, as here, a cause of action is based on several distinct factual circumstances, a defendant meets its burden to show a claim is subject to the anti-SLAPP statute if one of these factual circumstances supports the application of the statute, *unless* the protected conduct is " ' "merely incidental" ' " to other alleged unprotected conduct. (*Haight Ashbury Free Clinics, Inc. v. Happening House Ventures* (2010) 184 Cal.App.4th 1539, 1551; *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 672; *Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 103 (*Mann*).) If there are multiple factual grounds underlying a cause of action, the court must examine whether the claim is at least partially independently based on protected activity that is not incidental. (*Haight Ashbury, supra*, 184 Cal.App.4th at pp. 1550-1553; *Salma v. Capon* (2008) 161 Cal.App.4th 1275, 1287 ["mixed cause of action is subject to section 425.16 if at least one of the underlying acts is protected conduct, unless the allegations of protected conduct are merely incidental to the unprotected activity"]; *Mann, supra*, 120 Cal.App.4th at p. 103.) "[W]here the defendant shows that

18

the gravamen of a cause of action is based on nonincidental protected activity as well as nonprotected activity, it has satisfied the first prong of the SLAPP analysis." (*Haight Ashbury, supra*, at p. 1551, fn. 7.)

The protected activity—the commencement of the peer review proceedings and the communications regarding these proceedings—is not merely an incidental component of the retaliation claims. By notifying plaintiffs of the peer review investigation, the Hospital allegedly sought to silence plaintiffs and to pressure plaintiffs to resign and thus avoid a legal retaliation claim asserted against the Hospital. This is a significant predicate allegation underlying plaintiffs' retaliation claims, and cannot be considered an incidental allegation. Accordingly, the Hospital met its burden to show the retaliation claims were governed by the anti-SLAPP statute.

B. *Second Step: Probability of Prevailing*

Because we have found the Hospital met its burden to show the retaliation claims are governed by the anti-SLAPP statutes, we proceed to the second step of the analysis. Although the trial court did not reach this step, we may consider this issue because our review is de novo.

In this step, the burden shifts to the plaintiff to show a probability of prevailing on its claims. In meeting this burden, the plaintiff cannot rely solely on the allegations in the complaint and must present evidence that would be admissible at trial. (*Stewart v. Rolling Stone LLC* (2010) 181 Cal.App.4th 664, 679; *ComputerXpress, supra*, 93 Cal.App.4th at p. 1010.) However, the plaintiff's burden to show a "probability of prevailing is not high: We do not weigh credibility, nor do we evaluate the weight of the

19

evidence. Instead, we accept as true all evidence favorable to the plaintiff and assess the defendant's evidence only to determine if it defeats the plaintiff's submission as a matter of law." (*Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688, 699-700.)

A plaintiff meets its burden to show a probability of prevailing on a cause of action if *any* part of a claim has merit. (*Oasis West, supra,* 51 Cal.4th at p. 820; *Mann, supra,* 120 Cal.App.4th at pp. 105-106.) "If the plaintiff 'can show a probability of prevailing on *any part of its claim*, the cause of action is not meritless' and will not be stricken; 'once a plaintiff shows a probability of prevailing on any part of its claim, the plaintiff has established that its cause of action has some merit and the entire cause of action stands.' " (*Oasis West, supra*, 51 Cal.4th at p. 820, quoting *Mann, supra*, 120 Cal.App.4th at p. 106; *Burrill v. Nair* (2013) 217 Cal.App.4th 357, 379-382.)[3]

The Hospital contends plaintiffs did not satisfy their burden to show a probability of prevailing on their statutory retaliation claims because: (1) plaintiffs failed to exhaust their administrative remedies; (2) plaintiffs failed to sufficiently rebut the Hospital's proffered legitimate reasons for its actions; (3) there is no private right of action on plaintiffs' Business and Professions Code section 510 and 2056 claims; and (4) plaintiffs'

_____

[3]    Although we are aware of authority suggesting a SLAPP motion may be granted if a portion of a cause of action has no merit (see *City of Colton v. Singletary* (2012) 206 Cal.App.4th 751, 772-775), we choose to continue to follow our court's rule in *Mann* as recently endorsed by the California Supreme Court (*Oasis West, supra*, 120 Cal.App.4th at p. 820) and other Courts of Appeal (see *Burrill v. Nair, supra*, 217 Cal.App.4th at pp. 379-382).

claims are barred by governmental immunities. For the reasons explained below, we find these arguments to be without merit at this stage of the proceedings.

## 1. *Administrative Exhaustion*

" 'It is the general and well established jurisdictional rule that a plaintiff who seeks judicial relief against an organization of which he [or she] is a member must first invoke and exhaust the remedies provided by that organization applicable to his grievance.' " (*Westlake Community Hosp. v. Superior Court* (1976) 17 Cal.3d 465, 474-475 (*Westlake*); see also *Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 321-322; *Kaiser Foundation Hospitals v. Superior Court* (2005) 128 Cal.App.4th 85, 99-100.) Under this doctrine, " ' "a party must go through *the entire proceeding* to a '*final* decision on the merits of the entire controversy' before resorting to the courts for relief." ' " (*Eight Unnamed Physicians v. Medical Executive Committee* (2007) 150 Cal.App.4th 503, 511 (*Eight Unnamed Physicians*).)

The administrative exhaustion doctrine applies in medical disciplinary proceedings by a hospital's peer review committee or governing board. (*Westlake, supra*, 17 Cal.3d at p. 469; *Eight Unnamed Physicians, supra*, 150 Cal.App.4th at p. 511.) " '[T]he Legislature has granted to individual hospitals, acting on the recommendations of their peer review committees, the primary responsibility for monitoring the professional conduct of physicians licensed in California.' " (*Kibler, supra*, 39 Cal.4th at p. 201; *Eight Unnamed Physicians, supra*, 150 Cal.App.4th at pp. 510-511; see also *El-Attar v. Hollywood Presbyterian Medical Center* (2013) 56 Cal.4th 976, 988-989.)

21

However, the existence of an administrative remedy does not bar an action if the remedy was unavailable to the plaintiff. (See *SJCBC LLC v. Horwedel* (2011) 201 Cal.App.4th 339, 346.) In this case, the Hospital failed to identify an available administrative remedy for plaintiffs' claims that the Hospital retaliated against them by initiating peer review proceedings and terminating the Amended Agreement. The Hospital argues that plaintiffs had the right to challenge the adverse determinations through an internal quasi-judicial process. In support, they point to the Hospital bylaws providing a doctor with the right to a hearing to challenge an adverse peer review determination related to "*the practitioner's staff membership, staff status, or clinical privileges.*" (Italics added.) The bylaws provide that this internal appeal process must be exhausted before a lawsuit may be filed.

However, there is no showing that this internal remedy was available to plaintiffs. The evidence showed the Hospital did *not* make any adverse ruling with respect to the doctors' "staff membership, staff status, or clinical privileges" for which they were entitled to invoke their rights to a quasi-judicial hearing. On January 5, 2011, the Hospital's peer review committee notified Dr. Ramirez and Dr. Strauser that it was initiating an investigation regarding their December 2010 emails and stated that the doctors would be informed of the outcome of the investigation and would be given the opportunity to provide information at the appropriate time. According to plaintiffs' evidence, the Hospital then elected to terminate this peer review investigation and to instead seek to force the doctors' resignations by terminating the SDHBP contract through the Board's no-cause contract termination. At that point, there were no

22

administrative remedies to exhaust because the Hospital decided not to proceed with the peer review proceeding.

The Hospital argues that plaintiffs should have exhausted their administrative remedies because "[l]aymen are simply 'ill-equipped' to assess the judgment of qualified physicians on matters requiring study and extensive training" and thus "it is especially important for issues regarding quality of care to be addressed within the bounds of peer review committees." We agree with these general principles, but they are inapplicable here. Plaintiffs presented evidence that the Hospital made an explicit decision to withdraw the issue of plaintiffs' alleged rule violations from its established peer review process and instead to treat the issue as a Hospital management concern. Consistent with this evidence, in its anti-SLAPP moving papers, the Hospital specifically stated that its decision to terminate the contract was *not* related to a peer review determination concerning the plaintiff doctors' fitness to practice medicine at the Hospital and instead it was a "quasi-legislative" managerial decision motivated in part by the Board's desire to avoid the cost of litigation that could arise from a "for-cause" decision or from the peer review process. On this record, we find unpersuasive the Hospital's argument that plaintiffs are challenging a "peer review" determination that should have been resolved first through the internal peer-review administrative process.

In a similar contention, the Hospital asserts that by failing to exhaust their administrative remedies and failing to file a writ of mandate challenging the administrative decision, plaintiffs are attempting to make an "end-run" around the Hospital's established peer review process. However, it was the Hospital and not the

23

plaintiffs that made the decision to avoid the peer review process. The Hospital cannot have it both ways. If the Hospital wanted to submit the issue of plaintiffs' alleged rule violations to its own peer review process and seek to terminate or limit plaintiffs' medical staff privileges, it was required to respect those processes and allow those processes to operate according to the established rules. However, by allegedly seeking to avoid that administrative process for the alleged purpose of avoiding an eventual lawsuit, it cannot now complain that the plaintiffs were at fault for not exhausting administrative remedies.

In its reply brief, the Hospital suggests plaintiffs could have challenged the *contract termination* through an internal administrative process, even if the termination was unrelated to a peer review matter. The argument is waived because it was raised for the first time in the Hospital's reply brief. Further, there are factual issues regarding the availability and applicability of such remedies to challenge the Board's management decision and factual issues regarding whether plaintiffs were properly notified of the existence of such administrative appeal procedures at the time of the contract termination. Because the administrative exhaustion doctrine is an affirmative defense, the Hospital had the burden to present this evidence in the anti-SLAPP proceedings below. (*Peregrine Funding, Inc. v. Shepard Mullin Richter & Hampton LLP, supra*, 133 Cal.App.4th at p. 676; accord, *Premier Medical Management Systems, Inc. v. California*

*Ins. Guarantee Assn.* (2006) 136 Cal.App.4th 464, 477; *Seltzer v. Barnes* (2010) 182 Cal.App.4th 953, 969.)[4]

In support of its administrative exhaustion arguments, the Hospital relies primarily on *Nesson v. Northern Inyo County Local Hospital Dist.* (2012) 204 Cal.App.4th 65 (*Nesson*). In *Nesson*, a hospital *peer review committee* voted to summarily suspend a radiologist's medical staff privileges, citing " 'recent incidents of substandard and dangerous patient care' and 'abrupt change in your behavior characterized by volatile and erratic actions.' " (*Id*. at pp. 73-74.) *Based on the peer review's summary suspension decision*, the hospital's governing board then voted to terminate the contract under which the radiologist had agreed to provide radiology services (including personnel) at the hospital. (*Id.* at p. 74.) The evidence showed the radiologist agreement was conditioned on the radiologist maintaining his medical staff privileges. (*Id.* at p. 72.) Under the hospital bylaws, the radiologist had a right to an administrative hearing to challenge the peer review committee's summary suspension of his staff privileges, but neither he nor his attorney timely requested this hearing. (*Id.* at pp. 74-75.)

The radiologist then sued the hospital, asserting various claims including that the hospital had breached the radiology agreement by not giving him sufficient notice of the contract termination and retaliated against him for his complaints about patient safety.

---

4       Some courts have suggested the plaintiff has the burden to counter an affirmative defense in the anti-SLAPP context. (See *No Doubt v. Activision Publishing, Inc.* (2011) 192 Cal.App.4th 1018, 1029; *Birkner v. Lam* (2007) 156 Cal.App.4th 275, 285.) However, under the circumstances here, we adhere to the prevailing view that it is the defendant's burden. (See *Peregrine Funding, supra*, 133 Cal.App.4th at p. 676.)

(*Nesson, supra*, 204 Cal.App.4th at p. 75.) After finding the claims were subject to the anti-SLAPP statute, the *Nesson* court addressed the issue whether the radiologist could show a probability of prevailing on his claims despite that he did not exhaust his administrative remedies. (*Nesson, supra*, 204 Cal.App.4th at pp. 84-88.) The radiologist argued the exhaustion doctrine was inapplicable because the administrative process was " '*only* available to challenge the suspension of [his] medical privileges,' " and not the termination of his radiology agreement by the hospital board. (*Id.* at p. 85.)

The *Nesson* court accepted the argument that there were no specific administrative remedies to challenge the hospital board's *contract termination decision*, but rejected the contention that the radiologist lacked any administrative remedy under the circumstances. (*Nesson, supra*, 204 Cal.App.4th at pp. 85-87.) The court reasoned that the hospital board had terminated the radiology agreement *because* the radiologist had lost his medical privileges and thus the termination of the radiology agreement and the loss of the plaintiff's medical privileges were "inextricably intertwined." (*Id.* at p. 85.) The court explained: "Had [the radiologist] pursued and completed his internal administrative remedies, leading to a lifting of the summary suspension, he could have sought reinstatement of the [radiology agreement]. This would have cured [the radiologist's] material breach of the Agreement when he was suspended." (*Ibid*.) In other words, although there was no specific administrative remedy to challenge the hospital board's contract termination decision, the administrative exhaustion doctrine barred the action because if the radiologist had successfully exercised his administrative right to challenge

26

the peer review committee's determination, the board's contract termination decision would have been overturned.  (*Id.* at pp. 85-86.)

This case is materially different.  Other than initiating the investigation, the peer review committee did not take any adverse actions, or reach any conclusions, about the medical staff privileges of Dr. Ramirez or Dr. Strauser.  Thus, there were no final peer review actions for plaintiffs to challenge.  Additionally, the Board's decision in this case was wholly unrelated to any peer review proceedings or determinations about the doctors' privileges.  As the Hospital's chief of medical staff stated:  "I can state with certainty, that the Medical Staff membership and privileges of both [Dr. Strauser and Dr. Ramirez] were unaffected by the termination of the agreement between [Hospital and SDHBP].  Both retained their membership and privileges and remained able to admit and care for patients at [the Hospital]."  This case is thus unlike *Nesson* where the Board's termination of the agreement and the suspension of staff privileges were "inextricably intertwined." (*Nesson, supra*, 204 Cal.App.4th at p. 85.)

The Hospital also contends that plaintiffs should have sought renewal of their membership and privileges and filed an action to compel the Hospital to renew those privileges.  In support, it cites the general rule that once appointed to a hospital medical staff, a physician "may not be denied reappointment to the medical staff absent a hearing and other procedural prerequisites consistent with minimal due process protections." (*Anton v. San Antonio Community Hospital* (1977) 19 Cal.3d 802, 824.)  This rule is inapplicable here.  In their lawsuit, the plaintiff physicians were not challenging the Hospital's termination of their staff privileges or its refusal to renew the privileges.

27

Instead, plaintiffs were challenging the Hospital's termination of the Amended Agreement without cause and the Hospital's conduct improperly seeking to pressure them to resign for retaliatory purposes.

We also find unavailing the Hospital's argument that "[p]laintiffs chose to abandon available administrative and judicial remedies by allowing their privileges to lapse and walk away from the hospital and the Contract in or about July 2011." Although a factfinder may view plaintiffs' actions as an abandonment of their remedies, a factfinder could also conclude that plaintiffs did not voluntarily terminate their relationship with the Hospital and instead they were improperly coerced to leave the hospital by the Hospital's actions allegedly making their work conditions intolerable and by the Board's termination vote and the statements of the various Hospital officials pressuring them to resign.

The Hospital briefly mentions that plaintiffs could have pursued a writ of mandate under Code of Civil Procedure section 1085 to compel the Hospital to take " 'nondiscretionary action to comply with a contractual obligation.' " However, this code section provides a remedy when the plaintiff is seeking to compel a public defendant to exercise a ministerial, nondiscretionary task. On the record before us it is not clear that

28

the Hospital's obligations with respect to the Amended Agreement were ministerial and nondiscretionary.[5]

We conclude the administrative exhaustion defense does not bar this action at this stage of the proceedings.

## 2. *Retaliatory Motive*

The Hospital also contends plaintiffs did not meet their burden to show a probability of prevailing on their retaliation claims because they presented insufficient evidence to show the Hospital acted with a retaliatory motive, a necessary element of the statutory claims. (See Health & Saf. Code, § 1278.5; Bus. & Prof. Code, §§ 510, 2056.) In asserting this argument, the Hospital concedes that plaintiffs' evidence establishes a prima facie case of retaliation under these statutes, including that plaintiffs reported inadequate patient care to Hospital officials, and the alleged retaliatory actions occurred shortly after those complaints. (See Health & Saf. Code, § 1278.5, subd. (d)(1) [rebuttable presumption of retaliatory conduct if the adverse actions occur within 120 days after physician files a complaint].)

---

[5]    At oral argument, the Hospital's counsel noted the judicial exhaustion defense as an alternative reason that plaintiffs cannot prevail on their claims. However, by failing to assert and develop this argument in its appellate briefs, the Hospital waived the argument. (See *T.P. v. T.W.* (2011) 191 Cal.App.4th 1428, 1440, fn. 12.). A case pending before the California Supreme Court concerns the issue whether a physician must exhaust judicial remedies before pursuing whistleblower retaliation action under Health and Safety Code section 1278.5. (See *Fahlen v. Sutter Central Valley Hospitals* (2012) 208 Cal.App.4th 557, review granted Nov. 14, 2012, S205568.) Because the Hospital has not raised contentions relating to the judicial exhaustion defense, we need not reach this issue.

The Hospital nonetheless argues that this evidence did not satisfy plaintiffs' anti-SLAPP burden to show a retaliatory motive because the Hospital presented evidence showing "multiple legitimate, nondiscriminatory reason[s]" for initiating the peer review investigation and for terminating the Amended Agreement. The Hospital says these reasons include the fact that SDHBP was "impeding the efficient and smooth management of the Hospital," and that SDHBP failed to fulfill its contract obligation to provide high quality patient care. The Hospital further states it "made a rational decision to seek an 'amicable' resolution with Plaintiffs, short of continuing down the path of corrective action. Plaintiffs agreed and abandoned their administrative and judicial remedies which would have been afforded had they continued with the corrective action and tried to sustain the Contract."

A factfinder could be persuaded by the Hospital's arguments that its conduct was motivated solely by proper objectives and that plaintiffs agreed voluntarily to resign. However, a trier of fact could also decline to credit the Hospital's proffered justifications and find that the Hospital improperly coerced the resignations. Plaintiffs presented evidence that the alleged retaliatory acts occurred very shortly after they asserted their complaints about patient care and they also presented evidence of specific statements made by Hospital officials reflecting a retaliatory intent. Whether plaintiffs will ultimately prove their factual claims is not the question before us. The only issue is whether plaintiffs satisfied their minimal anti-SLAPP burden to present evidence supporting the retaliatory motive element of their retaliation claims. On the record before us, plaintiffs met this burden.

30

### 3. *Private Right of Action on Plaintiffs' Business and Profession Code Claims*

The Hospital also contends plaintiffs did not meet their burden to show a probability of prevailing on their Business and Professions Code sections 510 and 2056 claims because there is no private right of action under these statutes. In support of this assertion, the Hospital cites only to footnote 11 in *Khajavi v. Feather River Anesthesia Medical Group* (2000) 84 Cal.App.4th 32 at page 52. In this footnote, the *Khajavi* court observed that "we have no need to consider, and do not address" whether Business and Professions Code section 2056 "creates a separate statutory claim for wrongful termination . . . ." (*Ibid.*)

The *Khajavi* court's statement that it has no need to consider this issue does not support the Hospital's argument that there is no private right of action under Business and Profession Code sections 2056 and 510. By failing to cite relevant authority supporting its argument or to explain or develop its argument, the Hospital has waived the argument for purposes of this appeal. (See *Sabey v. City of Pomona* (2013) 215 Cal.App.4th 489, 499.)

### 4. *Governmental Immunities*

The Hospital contends governmental immunities bar plaintiffs' retaliation claims as a matter of law. In support of this argument, the Hospital cites Government Code sections 821.6, 815.2, and 820.2. None of these statutes preclude plaintiffs' retaliation claims at this stage of the litigation.

Government Code sections 821.6 and 820.2 bar actions against individual public employees; plaintiffs sued only the Hospital and not any individuals. Additionally, under

31

Government Code section 815.2, subdivision (b), the immunity provision applies "Except as otherwise provided by statute . . . ."  Because plaintiffs' retaliation claims are based on specific statutes prohibiting retaliation (Health & Saf. Code, § 1278.5; Bus. & Prof. Code, §§ 2056, 510), plaintiffs' claims fall within the "[e]xcept as otherwise provided by statute" clause.

### III.  *Breach of Contract Claim*

We next address the Hospital's contention the court erred in rejecting its argument that plaintiffs' breach of contract claim arises from protected activity under section 425.16, subdivision (e)(2).

In their complaint, plaintiffs allege the Hospital breached the Amended Agreement by:  (1) implementing a policy prohibiting SDHBP doctors from providing telephone orders to Hospital nurses regarding new admissions; (2) refusing to retain services and personnel to transfer patients from the emergency room to other hospitals with appropriate surgical care and/or medical equipment; and (3) terminating the contract without cause and without notice.

The first two allegations do not involve protected activity under section 425.16, subdivision (e)(2) because there is no showing the implementation of these policies occurred in connection with a "legislative, executive, or judicial body, or any other official proceeding authorized by law."  The alleged improper conduct occurred before any peer review process was initiated, and constituted business decisions by the Hospital unrelated to any official proceeding.  These allegations thus do not trigger anti-SLAPP protection.

32

The third allegation challenges the Board's termination of the contract during a closed session of a public Board meeting. Relying on *Kibler, supra*, 39 Cal.4th 192, the Hospital argues the contract claim based on this conduct arose from an "official proceeding." The Hospital maintains that the contract termination was related to the Hospital's decision as to how best to deliver patient care and thus broadly concerned a "peer review" matter under *Kibler, supra*, 29 Cal.4th 192.

Even assuming we agree the Board meeting was an "official proceeding authorized by law" under section 425.16, subdivision (e)(2) (either as the functional equivalent of a "peer review" proceeding or as an "official" meeting of a governmental agency), section 425.16 *also* requires a showing that the cause of action arose from a statement or writing "made in connection with an issue under consideration or review" by the "official" body. (*Young v. Tri-City Healthcare Dist.* (2012) 210 Cal.App.4th 35, 58 (*Young*); *Graffiti Protective Coatings, Inc. v. City of Pico Rivera* (2010) 181 Cal.App.4th 1207, 1218.) A hospital's action taken at an official proceeding does "not necessarily amount to its own exercise of free speech or petition rights." (*Young, supra*, 210 Cal.App.4th at p. 57; see *San Ramon Valley Fire Protection Dist. v. Contra Costa County Employees' Retirement Assn.* (2004) 125 Cal.App.4th 343, 354 (*San Ramon*).) Instead, there must be a showing that the challenged action itself implicated the defendant's free speech or petition rights. (*Young, supra*, 210 Cal.App.4th at pp. 56, 58; *Graffiti Protective Coatings, supra*, at pp. 1218-1225; *San Ramon, supra*, 125 Cal.App.4th at pp. 353-357.)

33

In this case, there is nothing about the contract *termination* that implicated the Hospital's free speech or petition rights. The breach of contract claim arose from the contract termination decision and not on any communicative conduct pertaining to that decision. As such, it is not protected SLAPP activity.

As explained in *San Ramon*, " '[t]he [anti-SLAPP] statute's definitional focus is . . . [whether] the defendant's activity *giving rise to his or her asserted liability* . . . constitutes protected speech or petitioning. [Citation.]' [Citation.] . . . Thus, the fact that a complaint alleges that a public entity's action was taken as a result of a majority vote of its constituent members does not mean that the litigation challenging that action *arose from* protected activity, where the measure itself is not an exercise of free speech or petition. Acts of governance mandated by law, without more, are not exercises of free speech or petition. '[T]he defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech. [Citation.]' [Citation.]" (*San Ramon, supra*, 125 Cal.App.4th at p. 354.)

Even if the Hospital made the decision to terminate the Amended Agreement at an "official proceeding," the record does not support that the substance of that decision constituted the exercise of the Board's right of speech or petition. The court thus did not err in concluding the breach of contract claim was not governed by the anti-SLAPP statute.

In any event, even if we were to find the breach of contract claim arose from protected activity, the court's ruling denying the Hospital's anti-SLAPP motion on this claim was proper on the second prong of the statutory test. Plaintiffs easily satisfied their

34

burden to demonstrate a probability of prevailing on its contract claim. Plaintiffs submitted evidence showing the existence of a contract, SDHBP's performance of the agreement, and the Hospital's breach of several contractual provisions.

The Hospital summarily argues that plaintiffs will be unable to prove their breach of contract claim because it had legitimate justifications for the termination. However, the issue of whether the justifications were legitimate or retaliatory are factual issues not properly resolved at this stage of the proceeding. Moreover, even if the Hospital can identify proper reasons to terminate the contract for cause, plaintiffs' evidence shows the Hospital elected to terminate the contract without the required notice and without cause.

IV. *Breach of Implied Covenant of Good Faith and Fair Dealing*

Plaintiffs also alleged a breach of the implied covenant of good faith and fair dealing against the Hospital. In this cause of action, plaintiffs claimed the Hospital's retaliatory conduct deprived SDHBP of the benefits to which it was entitled under the Amended Agreement. On appeal, the Hospital does not specifically challenge the court's anti-SLAPP ruling with respect to this cause of action. We thus find any argument regarding this claim is waived. In any event, we conclude that even assuming the anti-SLAPP statute applied to this claim, plaintiffs presented sufficient evidence to show a probability of prevailing on the merits of this claim. As explained in the retaliatory claim section, there are factual issues regarding whether the Hospital terminated the contract for retaliatory reasons and thus improperly deprived plaintiffs of the benefits of the contract.

35

DISPOSITION

Order affirmed.  Appellant to pay respondents' costs on appeal.


HALLER, J.

WE CONCUR:


HUFFMAN, Acting P. J.


AARON, J.